McGREGOR W. SCOTT
United States Attorney
LEE. S. BICKLEY
MICHAEL TIERNEY
Assistant United States Attorneys
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

**FILED**

JUL 1 3 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1: 1 8 CR - 0 0 1 5 5 LJO |
| Plaintiff, | PLEA AGREEMENT |
| v. | DATE: |
| SANDRA HAAR, | TIME:<br>COURT: Hon. |
| Defendant. | |

## I.   INTRODUCTION

### A.   Scope of Agreement.

The information in this case charges the defendant with violation(s) of 18 U.S.C. § 1347 –

healthcare fraud (Count 1) and 18 U.S.C. § 371 – Conspiracy to Receive Kickbacks (Count 2). This

document contains the complete plea agreement between the United States Attorney's Office for the

Eastern District of California (the "government") and the defendant regarding this case. This plea

agreement is limited to the United States Attorney's Office for the Eastern District of California and

cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B.   Court Not a Party.

The Court is not a party to this plea agreement. Sentencing is a matter solely within the

discretion of the Court, and the Court may take into consideration any and all facts and circumstances

concerning the criminal activities of defendant, including activities which may not have been charged in

PLEA AGREEMENT                                        1

1  the information. The Court is under no obligation to accept any recommendations made by the
2  government, and the Court may in its discretion impose any sentence it deems appropriate up to and
3  including the statutory maximum stated in this plea agreement.

4  If the Court should impose any sentence up to the maximum established by the statute, the
5  defendant cannot, for that reason alone, withdraw her guilty plea, and she will remain bound to fulfill all
6  of the obligations under this plea agreement. The defendant understands that neither the prosecutor,
7  defense counsel, nor the Court can make a binding prediction or promise regarding the sentence she will
8  receive.

9                          **II.      DEFENDANT'S OBLIGATIONS**

10    **A.    Guilty Plea.**

11    The defendant will plead guilty to 18 U.S.C. § 1347 – healthcare fraud (Count 1) and 18 U.S.C. §
12  371 – conspiracy to receive kickbacks (Count 2). The defendant agrees that she is in fact guilty of these
13  charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are
14  accurate.

15    The defendant agrees that this plea agreement will be filed with the Court and become a part of
16  the record of the case. The defendant understands and agrees that she will not be allowed to withdraw
17  her pleas should the Court not follow the government's sentencing recommendations.

18    The defendant agrees that the statements made by her in signing this Agreement, including the
19  factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by
20  the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a
21  guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f)
22  and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this
23  Agreement generally.

24                1.      Waiver of Indictment:

25    The defendant acknowledges that under the United States Constitution she is entitled to be
26  indicted by a grand jury on the charges to which she is pleading guilty and that pursuant to
27  Fed.R.Crim.P. 7(b) she agrees to waive any and all rights she has to being prosecuted by way of
28  indictment to the charges set forth in the information. The defendant agrees that at a time set by the

PLEA AGREEMENT                                    2

1 Court, she will sign a written waiver of prosecution by Indictment and consent to proceed by
2 Information rather than by Indictment.

3      **B.**   **Restitution.**

4      The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of
5 certain offenses.

6      Defendant agrees that her conduct is governed by the Mandatory Restitution Act pursuant to 18
7 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims affected by
8 this offense, including, but not limited to, the victims covered in the factual basis, and other victims as a
9 result of the defendant's conduct for the offenses charged from the periods of January 1, 2014, through
10 March 31, 2017. The parties agree that the amount of restitution will be between $6 million and $25
11 million. Payment of restitution shall be by cashier's or certified check made payable to the Clerk of the
12 Court. Defendant further agrees that she will not seek to discharge any restitution obligation or any part
13 of such obligation in any bankruptcy proceeding.

14      The restitution order can be offset via payment in the related civil case *United States v. Sandra*
15 *Haar* to be filed in this Court or a civil settlement between Sandra Haar and the United States Attorney's
16 Office for the Eastern District of California related to the facts in Exhibit A. Any payments received by
17 the U.S. Department of Health and Human Services or California Department of Health Care Services
18 (or related government victims in this case) stemming from the settlement agreement between Sandra
19 Haar and the Haar related parties, and the bankruptcy trustee, in bankruptcy case In Re Horisons
20 Unlimited (Eastern District Bankruptcy Case: 17-11824; Settlement agreement: ECF Doc 663) shall also
21 be considered an offset to the amounts set for in the restitution order. It is the defendant's obligation to
22 provide documentation to this Court of the payments made in that settlement/case and through that
23 bankruptcy in order to reduce her restitution obligations.

24      **C.**   **Fine.**

25      The defendant reserves the right to argue to Probation and at sentencing that she is unable to pay
26 a fine, and that no fine should be imposed. The defendant understands that it is her burden to
27 affirmatively prove that she is unable to pay a fine, and agrees to provide a financial statement under
28 penalty of perjury to the Probation Officer and the government in advance of the issuance of the draft

1  Presentence Investigation Report, along with supporting documentation.  The government retains the
2  right to oppose the waiver of a fine.  If the Court imposes a fine, the defendant agrees to pay such fine if
3  and as ordered by the Court, up to the statutory maximum fine for the defendant's offenses.

4      **D.**   **Special Assessment.**

5      The defendant agrees to pay a special assessment of $200 at the time of sentencing by delivering
6  a check or money order payable to the United States District Court to the United States Probation Office
7  immediately before the sentencing hearing.  The defendant understands that this plea agreement is
8  voidable at the option of the government if she fails to pay the assessment prior to that hearing.  If the
9  defendant is unable to pay the special assessment at the time of sentencing, she agrees to earn the money
10 to pay the assessment, if necessary by participating in the Inmate Financial Responsibility Program.

11     **E.**   **Violation of Plea Agreement by Defendant/Withdrawal of Plea(s).**

12     If the defendant, cooperating or not, violates this plea agreement in any way, withdraws her
13 plea(s), or tries to withdraw her plea(s), this plea agreement is voidable at the option of the government.
14 If the government elects to void the agreement based on the defendant's violation, the government will
15 no longer be bound by its representations to the defendant concerning the limits on criminal prosecution
16 and sentencing as set forth herein.  A defendant violates the plea agreement by committing any crime or
17 providing or procuring any statement or testimony which is knowingly false, misleading, or materially
18 incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct
19 constituting obstruction of justice.  Varying from stipulated Guidelines application or agreements
20 regarding arguments as to 18 United States Code section 3553, as set forth in this agreement, personally
21 or through counsel, also constitutes a violation of the plea agreement.  The government also shall have
22 the right (1) to prosecute the defendant on any of the counts to which she pleaded guilty; (2) to reinstate
23 any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that
24 would otherwise be barred by this plea agreement.  The defendant shall thereafter be subject to
25 prosecution for any federal criminal violation of which the government has knowledge.  The decision to
26 pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

27     By signing this plea agreement, the defendant agrees to waive any objections, motions, and
28 defenses that the defendant might have to the government's decision.  Any prosecutions that are not

PLEA AGREEMENT                                4

1  time-barred by the applicable statute of limitations as of the date of this plea agreement may be
2  commenced in accordance with this paragraph, notwithstanding the expiration of the statute of
3  limitations between the signing of this plea agreement and the commencement of any such prosecutions.
4  The defendant agrees not to raise any objections based on the passage of time with respect to such
5  counts including, but not limited to, any statutes of limitation or any objections based on the Speedy
6  Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as
7  of the date of this plea agreement. The determination of whether the defendant has violated the plea
8  agreement will be under a probable cause standard.

9      In addition, (1) all statements made by the defendant to the government or other designated law
10  enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,
11  whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or
12  administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no
13  claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal
14  Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by
15  the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed.
16  By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

17      **F.    Asset Disclosure.**

18      The defendant agrees to make a full and complete disclosure of her assets and financial
19  condition, and will complete the United States Attorney's Office's "Authorization to Release
20  Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change
21  of plea, including supporting documentation. The defendant also agrees to have the Court enter an order
22  to that effect. The defendant understands that if she fails to complete truthfully and provide the
23  described documentation to the United States Attorney's office within the allotted time, she will be
24  considered in violation of the agreement, and the government shall be entitled to the remedies set forth
25  in section II.E above.

26      **G.    Agreement to Cooperate.**

27      The defendant agrees to cooperate fully with the government and any other federal, state, or local
28  law enforcement agency, as directed by the government. As used in this plea agreement, "cooperation"

PLEA AGREEMENT                                 5

1   requires the defendant: (1) to respond truthfully and completely to all questions, whether in interviews,
2   in correspondence, telephone conversations, before a grand jury, or at any trial or other court
3   proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the
4   defendant's presence is requested by the government or compelled by subpoena or court order; (3) to
5   produce voluntarily any and all documents, records, or other tangible evidence requested by the
6   government; (4) not to participate in any criminal activity while cooperating with the government; and
7   (5) to disclose to the government the existence and status of all money, property, or assets, of any kind,
8   derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal
9   activities or the illegal activities of any conspirators.

10   ## III.    THE GOVERNMENT'S OBLIGATIONS

11   ### A.    Dismissals/Other Charges.

12   The government agrees not to bring any other charges arising from the conduct outlined in the
13   Factual Basis attached hereto as Exhibit A except if this agreement is voided as set forth herein, or as
14   provided in paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Plea(s)), III.C.3
15   (Reduction of Sentence for Cooperation), VI.B (Estimated Guideline Calculation), and VII.B (Waiver of
16   Appeal and Collateral Attack) herein.

17   ### B.    Other Charges

18   The government agrees not to bring charges against the following three individuals related to the
19   defendant: Sara Price, Norman Haar, and Karen Tlemcami (the "listed individuals") arising from the
20   conduct outlined in the Factual Basis attached as Exhibit A except if this agreement is voided as set forth
21   herein, or as provided in paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of
22   Plea(s)), III.C.3 (Reduction of Sentence for Cooperation), VI.B (Stipulated Guideline Calculation), and
23   VII.B (Waiver of Appeal and Collateral Attack) herein.

24   As with the other portions of this agreement, the agreement not to prosecute the listed individuals
25   is only binding on the U.S. Attorney's Office for the Eastern District of California and cannot bind any
26   other federal, state or local authority.

27   The defendant agrees that she is entering this plea agreement voluntarily because she is guilty of
28   the crimes described herein and not because of this agreement with respect to the listed individuals.

PLEA AGREEMENT                                    6

**C.   Recommendations.**

      1.   Incarceration Range.

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range as determined by the Court.

      2.   Acceptance of Responsibility.

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of her offense level if the defendant clearly demonstrates acceptance of responsibility for her conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

      3.   Reduction of Sentence for Cooperation.

The government agrees to recommend at the time of sentencing that the defendant's sentence of imprisonment be reduced by up to 50% of the applicable guideline sentence if she provides substantial assistance to the government, pursuant to U.S.S.G. § 5K1.1. The defendant understands that she must comply with paragraphs II.G and not violate this plea agreement as set forth in paragraph II.E herein. The defendant understands that it is within the sole and exclusive discretion of the government to determine whether the defendant has provided substantial assistance.

The defendant understands that the government may recommend a reduction in her sentence of less than 50% or no reduction at all; depending upon the level of assistance the government determines that the defendant has provided.

The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a recommendation and is not binding on the Court, that this plea agreement confers no right upon the defendant to require that the government make a § 5K1.1 motion, and that this plea agreement confers no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion. In particular, the defendant agrees not to try to file a motion to withdraw her guilty plea(s) based on the fact that the government decides not to recommend a sentence reduction or recommends a sentence

1  reduction less than the defendant thinks is appropriate.

2         If the government determines that the defendant has provided further cooperation within
3  one year following sentencing, the government may move for a further reduction of her sentence
4  pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

5      **D.**   **Use of Information for Sentencing.**

6         The government is free to provide full and accurate information to the Court and Probation,
7  including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate
8  statements or arguments by the defendant, her attorney, Probation, or the Court.  The defendant also
9  understands and agrees that nothing in this Plea Agreement bars the government from defending on
10  appeal or collateral review any sentence that the Court may impose.

11                 **IV.**   **ELEMENTS OF THE OFFENSE**

12         At a trial, the government would have to prove beyond a reasonable doubt the following
13  elements of the offense to which the defendant is pleading guilty, health care fraud, in violation of Title
14  18, United States Code § 1347:

15         First, the defendant knowingly and willfully executed or attempted to execute a scheme or plan
16  to defraud any health care benefit program, or the defendant knowingly and willfully executed or
17  attempted to execute a scheme or plan to obtain any of the money or property owned by, or under the
18  custody or control of, any health care benefit program by means of material false or fraudulent
19  pretenses, representations, or promises;

20         Second, the defendant acted with the intent to defraud;

21         Third, the victim or intended victim was a health care benefit program; and

22         Fourth, the scheme or plan was executed in connection with the delivery or payment for health
23  care benefits, items or services.

24         A health care benefit program is any public or private plan or contract, affecting commerce,
25  under which any medical benefit, item, or service is provided to any individual, and includes any
26  individual or entity who is providing a medical benefit, item, or service for which payment may be made
27  under the plan or contract.  18 U.S.C. § 24(b).

28         At a trial, the government would have to prove beyond a reasonable doubt the following

PLEA AGREEMENT       8

1  elements of the offense to which the defendant is pleading guilty, conspiracy to violate the Anti-

2  Kickback Statues, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b:

3       First, beginning on or about February 2014, and ending on or about March 2017, there was an

4  agreement between two or more persons to commit at least one crime as charged in the information,

5  violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)(A);

6       Second, the defendant became a member of the conspiracy knowing of at least one of its objects

7  and intending to help accomplish it; and

8       Third, one of the members of the conspiracy performed at least one overt act on or after February

9  2014 for the purpose of carrying out the conspiracy.

10      The elements of the offense, receipt of kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(1)(A)

11 are as follows: (1) the defendant knowingly and willfully solicited or received any remuneration; (2) the

12 remuneration was solicited or paid primarily to induce or in exchange for the referral of a patient insured

13 by Medicare, Medi-Cal or another federal health care program; (3) the patient's services were covered,

14 in whole or in part, by Medicare, Medi-Cal or another federal health care program; and (4) Medicare and

15 Medi-Cal are federal health care programs.

16      The defendant fully understands the nature and elements of the crimes charged in the information

17 to which she is pleading guilty, together with the possible defenses thereto, and has discussed them with

18 her attorney.

19                    V.    **MAXIMUM SENTENCE**

20  **A.    Maximum Penalty.**

21      The maximum sentence that the Court can impose for a violation of the health care fraud statute,

22 18 U.S.C. § 1347, is 20 years of incarceration, a fine of $250,000 or twice the value of the gross gain

23 derived from the fraud, a 3 year period of supervised release and a special assessment of $100. The

24 maximum sentence that the Court can impose for a violation of 18 U.S.C. § 371, conspiracy to receive

25 kickbacks is five years of incarceration, a fine of $250,000 or twice the value of the gross gain derived

26 from the fraud, a 3 year period of supervised release and a special assessment of $100. The Court may

27 order those sentences to run consecutively. By signing this plea agreement, the defendant also agrees

28 that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful

PLEA AGREEMENT                              9

1  conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the
2  specific count(s) to which she is pleading guilty. The defendant further agrees, as noted above, that she
3  will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by
4  the Court.

5  **B.    Violations of Supervised Release.**

6      The defendant understands that if she violates a condition of supervised release at any time
7  during the term of supervised release, the Court may revoke the term of supervised release and require
8  the defendant to serve up to two additional years imprisonment.

9  **VI.    SENTENCING DETERMINATION**

10  **A.    Statutory Authority.**

11      The defendant understands that the Court must consult the Federal Sentencing Guidelines and
12  must take them into account when determining a final sentence. The defendant understands that the
13  Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the
14  Sentencing Guidelines and must take them into account when determining a final sentence. The
15  defendant further understands that the Court will consider whether there is a basis for departure from the
16  guideline sentencing range (either above or below the guideline sentencing range) because there exists
17  an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into
18  consideration by the Sentencing Commission in formulating the Guidelines. The defendant further
19  understands that the Court, after consultation and consideration of the Sentencing Guidelines, must
20  impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

21  **B.    Stipulated Guideline Calculation.**

22      The government and the defendant agree that there is no material dispute as to the following
23  sentencing guidelines variables and therefore stipulate to the following:

24      1.    Base Offense Level:  7 (U.S.S.G. § 2B1.1(a)(1)).

25      2.    Loss Amount: +18 (U.S.S.G. § 2B1.1(b)(1)(J)).

26      3.    Victim-related Adjustments:  None.

27      4.    Federal Health Care Offense:  +2 (U.S.S.G. § 2B1.1(b)(7)).

28      5.    Role in the Offense Adjustment:  +2 (U.S.S.G. § 3B1.1 (c)).

PLEA AGREEMENT                                    10

1

    6.     Abuse of Position of Trust:  +2 (U.S.S.G. § 3B1.3).

2

    7.     Adjusted Offense Level:  31

3

    8.     Acceptance of Responsibility: See paragraph III.C.2 above.

4

5

    9.     Criminal History:  The parties estimate, but do not stipulate, that the defendant's criminal history category will be I.  The defendant understands that if the criminal history category differs from the parties' estimate, her Guidelines sentencing range may be higher.

6

7

    10.    Departures or Other Enhancements or Reductions:

         The parties agree that they will not seek or argue in support of any other specific

8

offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of

9

Responsibility"), or cross-references, except that the government may move for a departure or an

10

adjustment based on the defendant's cooperation (§5K1.1) or post-plea obstruction of justice (§3C1.1).

11

Both parties agree not to move for, or argue in support of, any departure from the Sentencing

12

Guidelines, or any deviance or variance from the Sentencing Guidelines under United States v. Booker,

13

543 U.S. 220, 125 S.Ct. 738 (2005).  The defendant is free to recommend to the Court whatever

14

sentence she believes is appropriate under 18 U.S.C. § 3553(a).

15

### VII.    WAIVERS

16

#### A.    Waiver of Constitutional Rights.

17

    The defendant understands that by pleading guilty she is waiving the following constitutional

18

rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to

19

be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to

20

testify on her behalf; (e) to confront and cross-examine witnesses against her; and (f) not to be

21

compelled to incriminate herself.

22

#### B.    Waiver of Appeal and Collateral Attack.

23

    The defendant understands that the law gives the defendant a right to appeal her guilty plea,

24

conviction, and sentence.  The defendant agrees as part of her pleas, however, to give up the right to

25

appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not

26

exceed the statutory maximums for the offenses to which she is pleading guilty.  The defendant

27

specifically gives up the right to appeal any order of restitution the Court may impose.

28

PLEA AGREEMENT

11

1   Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if
2   one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the
3   statutory maximums; and/or (2) the government appeals the sentence in the case.  The defendant
4   understands that these circumstances occur infrequently and that in almost all cases this Agreement
5   constitutes a complete waiver of all appellate rights.

6   In addition, regardless of the sentence the defendant receives, the defendant also gives up any
7   right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any
8   aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

9   Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever
10  attempts to vacate her pleas, dismiss the underlying charges, or modify or set aside her sentence on any
11  of the counts to which she is pleading guilty, the government shall have the rights set forth in Section
12  II.E herein.

13  **C.    Waiver of Attorneys' Fees and Costs.**

14  The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-
15  119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the
16  investigation and prosecution of all charges in the above-captioned matter and of any related allegations
17  (including without limitation any charges to be dismissed pursuant to this plea agreement and any
18  charges previously dismissed).

19  **D.    Impact of Plea on Defendant's Immigration Status.**

20  Defendant recognizes that pleading guilty may have consequences with respect to her
21  immigration status if she is not a citizen of the United States.  Under federal law, a broad range of
22  crimes are removable offenses, including offense(s) to which the defendant is pleading guilty.  The
23  defendant and her counsel have discussed the fact that the charge to which the defendant is pleading
24  guilty is an aggravated felony, or a crime that is likely to be determined to be an aggravated felony under
25  8 USC § 1101(a)(43), and that while there may be arguments that defendant can raise in immigration
26  proceedings to avoid or delay removal, it is virtually certain that defendant will be removed.  Removal
27  and other immigration consequences are the subject of a separate proceeding, however, and defendant
28  understands that no one, including her attorney or the district court, can predict to a certainty the effect

1  of her conviction on her immigration status. Defendant nevertheless affirms that she wants to plead

2  guilty regardless of any immigration consequences that her plea may entail, even if the consequence is

3  her automatic removal from the United States.

4  ### VIII.    ENTIRE PLEA AGREEMENT

5  Other than this plea agreement, no agreement, understanding, promise, or condition between the

6  government and the defendant exists, nor will such agreement, understanding, promise, or condition

7  exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and

8  counsel for the United States.

9  ### IX.    APPROVALS AND SIGNATURES

10  **A.    Defense Counsel.**

11  I have read this plea agreement and have discussed it fully with my client. The plea agreement

12  accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to

13  plead guilty as set forth in this plea agreement.

14  Dated: 7/2/2018 .

15  PAUL WOLF
   Attorney for Defendant

16

17

18  **B.    Defendant:**

19  I have read this plea agreement and carefully reviewed every part of it with my attorney. I

20  understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully

21  understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my

22  case. No other promises or inducements have been made to me, other than those contained in this plea

23  agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement.

24  Finally, I am satisfied with the representation of my attorney in this case.

25  Dated: 6/29/2018

26  SANDRA HAAR
   Defendant

27

28

PLEA AGREEMENT                                    13

**C.** **Attorney for United States:**

I accept and agree to this plea agreement on behalf of the government.

Dated: 7/5/18

McGREGOR W. SCOTT
United States Attorney

LEE S. BICKLEY
MICHAEL TIERNEY

Assistant United States Attorneys

1

EXHIBIT "A"
Factual Basis for Plea(s)

2

3   Beginning no later than January 1, 2014 and continuing until March 2017, defendant Sandra
Haar knowingly and willfully executed a scheme to defraud health care benefit programs and a scheme
to obtain money under the control of health care benefit programs by means of materially false and
4   fraudulent pretenses, representations and promises. In doing so, Haar acted with the intent to defraud.
The scheme was executed in connection with the delivery and payment for health care benefits, items or
5   services.

6   Haar was a licensed nurse practitioner. She was the founder and chief executive officer of
Horisons Unlimited ("Horisons"). Haar founded Horisons in 2004 as a California nonprofit public
7   benefit corporation to provide outpatient health and dental services through a network of eight clinics
servicing the underserved populations of Merced and surrounding communities.

8

Medicare and Medi-Cal are "health care benefit programs" of the United States, as defined in 18
9   U.S.C. § 24. Furthermore, Medicare and Medi-Cal are health care benefit programs affecting
commerce.

10

Beginning no later than January 1, 2014, Haar through Horisons began knowingly and willfully
11   billing Medicare and Medi-Cal for services that she knew were not reimbursable. Haar's scheme
included but was not limited to the following:

12

13   1.   Haar knowingly and willfully billed Medi-Cal for medical services provided by
unlicensed individuals but misrepresented to Medi-Cal that the services were rendered by
licensed doctors, nurse practitioners, and clinical social workers. Haar knew that Medi-
14   Cal would not have reimbursed these claims had they known that unlicensed individuals
had provided the medical services. For example, Haar knowingly and willfully submitted
15   bills to Medi-Cal for licensed clinical social worker visits when patients were seen
instead by an unlicensed Christian counselor. Medi-Cal would not have reimbursed these
16   claims if it had known that the counselor was not a licensed clinical social worker. In
addition, unlicensed foreign medical students were seeing pain management patients and
17   prescribing opioids at Horisons and bills were submitted to Medi-Cal for these services.
Medi-Cal would not have reimbursed such claims.

18

2.   Haar knowingly and willfully billed Medi-Cal for health and dental services that
19   were not rendered. Haar knew that if Medi-Cal had known that services had not been
rendered, it would not have reimbursed Haar. For example, Haar told an employee in the
20   billing department to change the visit dates for patients in order to justify more billings.

21   3.   From 2014 to 2016, acupuncture was not reimbursable by Medi-Cal. Haar
knowingly and willfully billed Medi-Cal for acupuncture services. She instructed
22   employees to change the medical records not to say acupuncture but to make
misrepresentations that other reimbursable health care services had been provided. Haar
23   knew if Medi-Cal had known that Haar was billing for acupuncture, it would not have
reimbursed Haar.

24

4.   Haar knowingly and willfully billed Medi-Cal for office visits with purportedly
25   licensed doctors as the rendering providers when patients instead were dispensed
Suboxone, an opioid, in the parking lots of McDonald's and Rite Aid in Ziploc baggies.
26   Haar knew Medi-Cal would not have reimbursed for these "services."

27

28

PLEA AGREEMENT                                    A-1

5. Haar knowingly and willfully billed Medi-Cal for experimental treatments such as "Oral Id," "Healthy Hearts," and "Cold Laser." Haar knew that Medi-Cal would not reimburse for such treatments and she would hide the true service from Medi-Cal by for example billing for generic medical and dental claims.

6. Haar knowingly and willfully billed Medi-Cal for unnecessary health care services. For example, when numbers were down at the Horisons clinics Haar would cause employees who were covered by Medi-Cal to be seen in order to increase numbers and reimbursements. Such medical treatment was unnecessary and Haar knew that Medi-Cal would not reimburse for such unnecessary treatment. In addition, Haar would require Horisons patients to be seen multiple time when they could have been treated in one visit. Patients were told to return to the clinic in one week to be seen again in order to increase Medi-Cal reimbursements to Horisons. This was to increase the amount reimbursed to Haar. In addition, Haar required patients to receive not medically necessary tests. Haar knew if Medi-Cal had known about such rounding up of employees to be seen, patient churning, and unnecessary medical tests it would not have reimbursed any of these claims.

7. Haar knowingly and willfully billed Medi-Cal for unnecessary orthodontia services. Haar knew that Medi-Cal would only reimburse for orthodontia on certain patients and that Medi-Cal required documentation necessary for authorization to be filled out and maintained before services were provided. Nevertheless, Haar instructed a dentist working at Horisons who was not licensed to provide orthodontia at the time to provide orthodontia to all patients without filling out the documentation. Haar knew that if Medi-Cal had learned about this practice it would have denied the orthodontia claims.

8. When patients came for routine office visits, Haar routinely billed Medi-Cal for licensed clinical social work visits rather than a routine office visit in order to increase the reimbursement to Horisons. Haar knew that if Medi-Cal had been aware of such claims, it would have denied them.

9. Haar knowingly and willfully billed Medicare for visits in which patients had their toe nails clipped. Haar caused her employees to falsely represent in medical records that these services were for the treatment of mycotic toenails. Haar knew Medicare does not reimburse for clipping of toenails and would not have reimbursed these claims had they known that the services were only for toenail clippings.

10. Haar routinely instructed employees to change medical records and make up diagnoses in order to support claims submitted to Medi-Cal and Medicare. Haar knew Medi-Cal and Medicare would not have reimbursed claims based on false medical records.

For example, on or about June 1, 2015, Haar billed Medi-Cal $212 for heroin detoxification services and was reimbursed $160.60 on or about August 1, 2016, for Patient A. Instead of being seen at a clinic, Patient A was not treated but rather was just dispensed Suboxone in a Ziploc bag in a parking lot. Haar knew Medi-Cal would not have reimbursed for this "service" if it had known the true nature of the visit.

For example, Haar on or about June 4, 2014, billed Medi-Cal $142 for Patient B being seen by a licensed clinical social worker and was reimbursed $91.27 on or about July 21, 2014. Patient B was not seen by a licensed clinical social worker but rather was seen by an unlicensed Christian counselor. Haar knew Medi-Cal would not have reimbursed for this service.

PLEA AGREEMENT                                          A-2

1      For example, Haar also billed Medi-Cal for dental and medical services that were not rendered
for Patient C on or about June 27, 2014 (billed $143 and paid $97.02), for Patient D on or about August
2  1, 2014 (billed $138 and paid $53.71), and for Patient E on or about July 16, 2015 (billed $138 and paid
3  $58.81). Haar knew Medi-Cal would not have paid any of these amounts if it had known services were
not rendered.
4
       Between January 1, 2014, and March 31, 2017, Haar profited and gained by at least
5  $3,722,206.50 from her fraud. Medi-Cal and Medicare lost millions of dollars, at least $3,722,206.50.

6      Beginning in approximately February 2014, and continuing through approximately March 2017,
7  defendant Haar knowingly and willfully conspired and agreed with others to receive kickbacks, in
violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1)(A). Haar knowingly and willfully received
8  kickbacks from an account executive at Latara Enterprise d/b/a Foundation Laboratory ("Foundation
Lab"), a medical laboratory testing company, primarily in exchange for Haar directing that laboratory
9  testing for Horisons' Medi-Cal and Medicare patients be conducted by Foundation Lab. The account
executive from Foundation Lab paid Haar approximately $1,000 a month in cash in order to refer Medi-Cal
10  and Medicare patient referrals to continue coming to Foundation Lab. Haar pocketed the money and
11  used it as spending money. Haar and the account executive kept their arrangement confidential and
referred to the kickback as a donation for a church as they knew it violated the law. The money did not
12  go to a church. Foundation Lab billed Medicare and Medi-Cal over $9 million in medical laboratory
services fees for patients Haar caused to be referred from Horisons.
13
14      In furtherance of the conspiracy on or about February 12, 2016, the account executive from
Foundation Lab paid Haar at least $1,000 in cash in order to refer Medicare and Medi-Cal patients to his
15  employer Foundation Lab for laboratory testing services. On or about February 15, 2016, Haar caused a
doctor at Horisons to request Foundation Lab to test Patient A's urine and bill Medi-Cal for that service.
16  Foundation Lab billed Medi-Cal $210 for those tests and received $52.56 from Medi-Cal. On or about
17  February 15, 2016, Haar caused the same doctor to request Foundation Lab to conduct a Vitamin D test
on Patient B. Foundation Lab billed Medicare $75.00 for that service and was reimbursed $39.52. On
18  or about April 20, 2016, the account executive paid Haar at least $2,000 in cash in order to refer
Medicare and Medi-Cal patients to his employer Foundation Lab for laboratory testing services.
19
      The value of the improper benefit that was conferred upon Foundation Lab and the value of the
20  action to be taken or effected in return for the bribes to Haar was $2,385,640.35.

PLEA AGREEMENT                                    A-3