MCGREGOR W. SCOTT
United States Attorney
LEE S. BICKLEY
MICHAEL TIERNEY
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2724
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SANDRA HAAR,<br><br>Defendant. | CASE NO. 1:18-CR-0155 LJO<br><br>UNITED STATES' SENTENCING MEMORANDUM FOR SANDRA HAAR<br><br>Date:  November 4, 2019<br>Time:  11:00 a.m.<br>Court: Honorable Lawrence J. O'Neill |

## I.   INTRODUCTION

The United States recommends that the defendant be sentenced to 78 months in prison, 3 years of supervised release, a restitution order of $6,107,846.85, and a special assessment of $100. The United States supports the Guidelines calculation that the parties agreed to in the Plea Agreement. With the application of acceptance of responsibility, that results in a total offense level of 28 with a Guidelines sentencing range of 78-97 months.

## II.   FACTS

The defendant was a licensed nurse practitioner who founded Horisons Unlimited ("Horisons") in 2004 to provide outpatient health and dental services through a network of eight clinics serving the

United States' Sentencing Memorandum for Sandra Haar        1

underserved populations of Merced and surrounding communities. However, instead of working to help the community she said she wanted to help, Haar used Horisons to enrich herself and her family through fraud. Her fraudulent conduct came at the expense of her patients, her staff, and the Medi-Cal and Medicare programs.

### A. Haar enriched herself through her position at Horisons.

Haar and her husband, whom she employed at Horisons, made over $1.2 million in reportable income in 2014. They made over $1 million in reportable income in 2015. In addition to this income, Haar received thousands of dollars in cash kickbacks from G.A. in order for Haar to direct Horisons' lab testing to the company for which he worked. Haar also employed at Horisons her two daughters, her two nieces, her sister, her sister in law, and her son in law (in addition to her husband).

### B. Haar committed fraud and received kickbacks in order to enrich herself.

As detailed in the PSR, Haar committed fraud and received kickbacks in order to enrich herself.

Haar billed Medi-Cal for medical services provided by unlicensed individuals while misrepresenting these services were provided by licensed doctors, nurse practitioners, and clinical social workers. She billed Medi-Cal for services that were not rendered. She billed Medi-Cal for services that were not covered by Medi-Cal, having others change the medical records to make it appear that the services were reimbursable. For example, Haar billed Medi-Cal for medical visits when patients were dispensed Suboxone in Ziploc baggies in a parking lot. Other examples include telling employees to falsely represent that toe nail clippings were treatment for mycotic toenails and not to mention acupuncture in bills as Haar knew it was a non-reimbursable service. Haar billed for unnecessary medical and dental services, such as having her employees who were covered by Medi-Cal be seen to increase reimbursements from Medi-Cal and having unnecessary laboratory testing done.

Haar received thousands of dollars in cash kickbacks from G.A. in envelopes in order to direct laboratory testing to his employer. Haar and G.A. falsely referred to the cash payments as donations to her church when in fact the money was used as Haar's spending money. In January 2017, after Haar had her stroke, she went back to work for half days. She wrote G.A. an e-mail to schedule lunch and instructed him, "Donation please keep confidential." G.A. responded, "I usually do. It's in my. Eat [sic] interest trust me."

United States' Sentencing Memorandum for Sandra Haar

2

### C. **Patients suffered.**

Many patients interviewed complained concerning the quality of care at Horisons. For example, one patient complained that he felt the office was abusing his insurance and just wanted to see him so they could get more money. Another said he thought Horisons seemed like a Medi-Cal scam. Another described Horisons as a money making scheme. Another described that she felt like a guinea pig and that the staff did not even know how to draw blood. Another said Horisons was the worst place from which she had ever received medical treatment and that it was not legit. Another said Haar treated "us like second class citizens," was double billing, and was taking advantage of the elderly and mentally challenged.

Haar had unlicensed individuals providing medical and dental care for patients, including pain management and orthodontia services. For example, one patient complained that an unlicensed "doctor" from Nigeria performed "cold laser" on her and it just made her hurt more. The same patient said that Horisons had unlicensed individuals doing orthodontia and putting the brackets on wrong. After Haar left Horisons, a new orthodontist had to fix them. One employee dental assistant said that the orthodontia was pretty bad and that she had to do everything. She put brackets and bands on patients and learned after leaving Horisons that most of what she was made to do at Horisons is against state law.

Haar had no respect for patients' time or medical care. Her concern was making money. As the primary way Horisons made money was to bill per visit, it was in Haar's interest to have patients come back for more visits. One employee said that Haar told her that a patient needs to come back three times a week and if a patient does not come back three times a week then the employee was not doing her job. Another talked about how she felt pressured to refer patients for additional services even when they were not medically necessary. Patients interviewed talked about having to come back multiple times in a week to Horisons, sometimes almost every day, and waiting for hours to be seen. One, who came in approximately three times a week, said she could not get her allergy medicine at the same time as her anxiety medicine. Another patient described her time at Horisons as "they owned us." If patients came into Horisons for medical care, they might be told to get an experimental treatment like Oral Id and then Haar would bill for an additional dental visit.

Dental work would be broken down into multiple visits. For example, a general teeth cleaning or

United States' Sentencing Memorandum for Sandra Haar

3

root canal routinely could take four visits as procedures were done on only one quadrant of the mouth at a time (upper right, upper left, lower right, lower left) or the procedure would be broken down into portions. Orthodontia patients received their braces in eight visits with follow up appointments, including separate visits for a top separator, a bottom separator, top bands, bottom bands, top brackets, and bottom brackets. In addition, orthodontia patients would need their teeth cleaned ever six months. This would involve coming in to have the wires removed and then being scheduled for a cleaning. Sometimes patients would have their braces on for six years. One mother described that she was told (falsely) that her daughter could not receive all her orthodontia hardware at once because Medi-Cal would not cover it. After getting the braces in multiple steps, her daughter asked when she would get them off and was not given an answer. The daughter eventually took them off herself with the help of a friend after getting fed up with Horisons.

The treatment at Horisons had serious consequences at times. One patient recently called our office to complain that her skin cancer had not been diagnosed by Horisons. Luckily, Horisons closed and her new doctor referred her to an appropriate skin specialist. Another patient complained that she believed she became addicted to opioids because of Horisons. Another complained that she felt pushed to take more drugs rather than decrease her pain management medication. Another complained that the staff kept pushing her to get more pain medication and higher doses. Other patients complained that they felt they were given too many pain medications. One dental patient said she saw patients asking for oxycodone and they received the prescriptions without being evaluated for a medical condition. This makes sense. Keeping patients addicted to opioids is a way to assure a steady stream of Horisons customers.

The doctor Haar had "running" her pain management program under whose name opioids were prescribed and services were billed was an 88-year-old physician, who surrendered his medical license due to "mental impairment affecting competency," after this and the Medical Board's investigations shed light on the bad practices and fraudulent conduct at Horisons. Unlicensed providers saw patients and then billed under Haar's or that doctor's name. One employee described how Haar gave the 88-year-old doctor a pack of triplicate prescription pads to sign that were blank for controlled substances. When he was reluctant to sign it, Haar yelled at him and told him he would never get a job like this.

Patients had unnecessary medical tests, including blood draws, performed on them in order to justify

more reimbursements for visits and to funnel more laboratory tests to Foundation.

Haar did not like being questioned by Horisons patients. She told one employee she preferred the Spanish speaking population in the Valley because they did not question her. Patients were sometimes not given their medical records when they requested them. When one patient complained to Haar about her treatment as Horisons, Haar called her a "bitch" and threatened if she complained to anyone she would be kicked out of Horisons.

### D. Haar's staff suffered.

Haar ordered her staff to commit fraud. She instructed her staff to change medical records and lie. She instructed unlicensed staff to provide medical services.

Haar, who was making millions of dollars herself, employed staff who made so little they were on Medi-Cal. In order to enrich herself, when numbers were low at the clinics, she would round up the staff to have unnecessary medical appointments and tests, which were then billed to Medi-Cal.

Haar would berate her staff. For example, Haar yelled at one employee, whom she asked to lie, and called her "Dumb Dora" and "Short Mexican." Another employee said Haar threatened employees' jobs all the time. Another employee said he committed the fraud Haar instructed him to do because he needed to provide for his family. Others said Haar did not like being questioned. For example, Haar's sister, who supervised Horisons' billing, said Haar withheld information from her and that Haar had to know about all the fraudulent billing because "[s]he gave out all the orders."

### E. Medi-Cal and Medicare lost money.

Medi-Cal and Medicare both lost money as a result of Haar's fraud – at least $6 million.

### III. GUIDELINES CALCULATION

The United States supports the Guidelines calculation that the parties agreed to in the Plea Agreement. With the application of acceptance of responsibility, that results in a total offense level of 28 with a Guidelines sentencing range of 78-97 months. (The only difference between the parties' calculation and that in the PSR is that the Probation Officer recommends a +4 adjustment for role in the offense while the parties agreed that this adjustment should be +2.)

### IV.  ARGUMENT

Given the nature and circumstances of the offense and the history and characteristics of the defendant, a 78-month sentence is appropriate. 18 U.S.C. § 3553(a)(1). As discussed in the PSR, Haar defrauded Medi-Cal and Medicare for millions of dollars over years. This was not a one-off fraud but a scheme in which Haar submitted fraudulent bill after fraudulent bill year after year. She directed others to engage in fraud month after month after month. The multiple means by which Haar engaged in fraud were only limited by her vast creativity. Haar's fraudulent behavior was not out of character for her. It was just how she did business.

The nature of the crime was such that not only Medi-Cal and Medicare were harmed but there was significant patient harm as well. When interviewed, patient after patient complained about the poor quality of care at Horisons. Patient after patient described how Horisons overprescribed opioids. Of course, Horisons had poor quality of care. Haar was hiring unlicensed and poorly-paid individuals to provide medical and dental care. She used an 88-year-old doctor who was mentally impaired to justify Horisons' pain management billings and to prescribe opioids. She was motivated by having patients return so she could bill more, not by whether she could help patients in the most efficient and effective way possible. She preferred Spanish speaking patients who would not ask any questions and was angry when a patient did.

While Haar submitted statements of family members who paint one picture of the defendant, the picture painted by her employees show another side of the defendant's character. One described how Haar was always concerned with money and had taken advantage of the employees by not paying overtime. Another described that Haar threatened peoples' jobs all the time. Another described how Haar yelled at her and called her "Dumb Dora" and "Short Mexican." Another saw Haar yell at the pain management doctor who was in his eighties and threaten his job in order to get him to sign blank prescriptions for controlled substances. Another employee said she had received presigned blank prescription pads from the doctor and that Haar had contacted her to tell her to hide things during audits and inspections. Another provider said that during a state audit, Haar told him to lie and say that he had been lazy about his notes.

The way Haar treated patients and employees as she conducted her fraud is part of the nature of the defendant's crime and part of her character. A 78-month sentence is warranted.

United States' Sentencing Memorandum for Sandra Haar

6

Haar's conduct was to her benefit. She enriched herself through fraud. While her patients in the Valley did not receive the medical care they deserved and her employees were poorly compensated, Haar was making millions for herself and her family. Crime should not pay.

The defendant may argue that her health issues justify a lesser sentence. That is just not true. First, as detailed more in the PSR and the letters accompanying it, Haar seems to be recovering well from her stroke in 2016. Her doctors seem positive about her recovery. She can drive and care for herself. She attends church. She can even take care of her grandchildren. Second, Haar was able to conduct her fraud both before and after her stroke. For example, she was e-mailing G.A. to schedule lunch and instructing him to keep the kickbacks confidential less than a month after her stroke.

A 78-month sentence would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). It would also afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). The United States also believes such a sentence would protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(C).

## V.     CONCLUSION

The United States respectfully asks that the Court sentence the defendant to 78 months in prison, 3 years of supervised release, a restitution order of $6,107,846.85, and a special assessment of $100.

Dated:  October 28, 2019                           Respectfully submitted,

MCGREGOR W. SCOTT
United States Attorney

 /s/ Lee S. Bickley
LEE S. BICKLEY
MICHAEL TIERNEY
Assistant United States Attorneys

United States' Sentencing Memorandum for Sandra Haar

7