1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL


UNITED STATES OF AMERICA,      )
                               ) 1:18-cr-155 LJO-SKO
          Plaintiff,           )
                               ) SENTENCE
     vs.                       )
                               )
SANDRA HAAR,                   )
                               )
          Defendant.           )
_____)

Fresno, California              Monday, November 4, 2019

          REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES OF COUNSEL**:

For the Government:        **MICHAEL G. TIERNEY**
                           Assistant U.S. Attorney
                           2500 Tulare Street, Rm. 4401
                           Fresno, California  93721

                           **LEE S. BICKLEY**
                           Assistant United States Attorney
                           501 I Street, Suite 10-100
                           Sacramento, CA 95814

For the Defendant:         LAW OFFICE OF PAUL D. WOLF
                           717 Washington Street
                           Second Floor
                           Oakland, CA 94607
                           BY:  **PAUL D. WOLF**

                           LAW OFFICE OF ADAM PENNELLA
                           717 Washington Street
                           Oakland, CA 94607
                           BY:  **ADAM PENNELLA**

REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1   Monday, November 4, 2019                    Fresno, California

2   8:30 a.m.

3           THE COURT:  Number 14 on calendar, Sandra Haar.

4           MR. WOLF:  It will take a moment, your Honor.  We

5   will be right up.

6           THE COURT:  Your appearances, please.

7           MS. BICKLEY:  Good morning, your Honor.  Lee Bickley

8   and Michael Tierney on behalf of the United States.

9           MR. WOLF:  Good morning, your Honor.  My name is Paul

10  Wolf.  I'm here with Adam Pennella, and we are here on behalf

11  of Ms. Haar, who is present, and ready for these proceedings.

12          THE COURT:  Ma'am, what is your name, please.

13          THE DEFENDANT:  Sandra Haar.

14          THE COURT:  Ms. Haar, have you had a chance to review

15  the Presentence Report with your attorney or attorneys?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Do you have any questions that remain?

18          THE DEFENDANT:  No, sir.

19          THE COURT:  Are you in the wheelchair because of the

20  stroke or a different issue?

21          THE DEFENDANT:  Both, sir.

22          MR. WOLF:  In the memo -- excuse me for interrupting,

23  your Honor.

24          She had foot surgery, trying to deal with the

25  neuropathy.  As we also have in the memo that she lost her

1  private insurance in August.  She got a decision within the

2  last month that she is fully disabled, and now has insurance

3  again and the ability be to get medical treatment.

4  So her doctor wanted to operate on this foot, and the

5  time he could do it was this past week.  That is the primary

6  reason she is in a wheelchair here today, your Honor, because

7  of the recent surgery and the pain attendant to standing up.

8  That's my understanding.  If she can correct me, I

9  have this information mostly from her.

10  THE COURT:  Do you agree or disagree?

11  THE DEFENDANT:  He is correct, but when I go

12  distances because of my brain and the stroke, I still need the

13  wheelchair.

14  THE COURT:  Got it.

15  THE DEFENDANT:  Not because I'm hobbling; because

16  what it does to my brain.

17  MR. WOLF:  That was also contained in the memo, your

18  Honor, attached in the doctors' reports.

19  THE COURT:  The Court has received and reviewed the

20  following:  The Presentence Report, the restitution demand,

21  the government's motion, sentencing motion, the defense

22  sentencing memorandum, the extensive medical records, the

23  defendant's second memo, the letters from the pastor, from

24  Ms. Haar herself, from an elder, a reverend, niece, sister,

25  foster children, husband, lawyer, child, the bankruptcy

1   trustee.

2          The Court notes pursuant to the PSR, the offense

3   level is 30.  History Category is I.  Guideline range is 97 to

4   121.

5          However, the government's motion indicates that they

6   believe, and I assume that defense agrees, that the offense

7   level is 28, History Category is I; therefore, the guideline

8   is 78 to 97.

9          MR. WOLF:  That's correct, your Honor.

10          THE COURT:  The Court has considered the 3553(a)

11   factors.

12          Now, do you wish to be heard further, Mr. Wolf?

13          MR. WOLF:  Yes, your Honor.  Of course, we have

14   submitted, as you have just recounted, quite a bit, and it is

15   a large memo.  We believe that in that memo, we presented the

16   mitigating factors and bases, what we hope are, I think, the

17   bases for a downward variance.

18          And of course, many of the things we said, many of

19   those factors were repeated, and I apologize for that.  Many

20   authors in one broth.  And to paraphrase the great Judge

21   Learned Hand, I wish, on re-reading it, that I had taken the

22   time to make it a bit shorter.

23          I'm not going to repeat an awful lot of that.  I'm

24   not going to repeat much of it at all.  I know, your Honor,

25   this Court would have very carefully reviewed all of this.

1            But since the writing and the submission of that

2    memo, we have received the government's memo, and I did have a

3    couple responses to that.

4            And the main thing that struck me, Judge, your Honor,

5    is that they were describing in this memo a person that has so

6    greatly changed, that what first came to my mind was this

7    isn't even really the same person, though, of course, it is

8    the very same person who conducted herself in that way:

9    Illegally, aggressively, offended her employees, broke the

10   law, and for a long time.

11           But the person who sits before you here today, the

12   person who you are sentencing today is a very, very changed

13   person.  And it's -- the change is hubris is involved, and,

14   therefore, I think of the tragedy almost being of Greek in

15   nature because she has fallen so far.

16           It starts, she had some medical issues before that,

17   the reflux, of course, but it was with the stroke and what

18   happened then, and then losing her ability to access the

19   company, of course, which was not necessarily inappropriate in

20   itself.

21           But for three years now, almost three years since

22   that stroke, the things that she has faced, the things she has

23   been confronted with, the things she had to deal with, not

24   inappropriately, but while she was weakened and ill.  As you

25   read, she couldn't even get a reliable test on the results of

1   the stroke and what needed to be next for almost four or five

2   months.

3          And during that time, she was confronted with the

4   CID, the civil investigation demand, and the civil claims that

5   were being made against her and others, but primarily her and

6   the company she had started.  And then the bankruptcy case

7   confronted her because they were looking for her to pay back a

8   good portion through the bankruptcy, and then the criminal

9   case came.  And she had to confront all the things she had

10  done wrong.

11         It went on for a year, and it went on after she had

12  suffered this stroke and was trying to recover from it, and

13  getting medical care to recover from it at a weakened time.

14  And not that that's bad, but that is when she changed.  That

15  is when she came to realize what she had done wrong and how

16  bad it was.

17         And that is -- before I pass on from that, we have

18  talked at length, and I have been doing this for a while,

19  criminal defense in federal courts, state courts.  I have

20  never argued religious faith as any kind of context or

21  explanation for this kind of conduct, but I do believe it is

22  true.

23         The letter of the husband, but also the letter of

24  Mr. Jenkins, who is here, that dealing with her, talking with

25  her, the others who have dealt with her and talked with her

1    and tried to understand, because this is not a bad person.

2          And what's -- that, you have heard many times about

3    fraud cases.  There is a lot of good in her.  We have laid it

4    out in the memo.

5          But what's unusual about this case from a fraud point

6    of view, from the fraud cases I have done, particularly big

7    fraud, continuous fraud, she didn't live any kind of lavish

8    lifestyle.

9          She didn't spend the money.  She kept it in the bank

10   accounts.  There was $6 million in Horisons' general accounts

11   when she had her stroke and when it was taken over.

12         And Mr. Salvan, the trustee, verifies what we know,

13   is that in five months, almost $2 million was billed by one

14   law firm before they put it into bankruptcy, and then wanted

15   to bill more money.  So that money was gone.

16         Now, it would have been better if it had gone

17   straight to the government, and I'm not complaining that it

18   was taken, again, but it was what happened to it, and that

19   money was dissipated.

20         So now she has gone into bankruptcy.  And you can see

21   she has put three and a half million dollars, or helped get it

22   there, either through property she sold -- I didn't mention

23   it, but she paid $40,000 cash to preserve another piece of

24   real estate so that it would be available to the civil

25   settlement that she was negotiating during this time and

1    cooperating with.  She helped to get $750,000 of insurance

2    money that nobody else came forward to trigger for the

3    bankruptcy.

4           She started in place a motion, hired a lawyer to make

5    arguments about the fees and diminish them.  And you can see

6    from Mr. Salvan's letter, that's extraordinary.  But the

7    problem is she puts in well over 3 million, and it settles

8    down to only 2.1 million coming back to the government because

9    it's gone all kinds of other places.

10           What else did she do with the money?  Well, there

11    were some things that were bought for herself and her family,

12    but it was a house -- it's now been sold for a little under

13    $600,000 -- she lived in for a couple years.  Now she is back

14    in a very small home.  It's all she is going to have left with

15    her husband.

16           As I put in the memo, she is going to have nothing

17    but Social Security, which she has mostly at this point, and

18    she will start to get now she's been found disabled, and a

19    home, and some medical insurance to live an extremely

20    diminished life.

21           I'm not going to go over all the medical issues.

22    They are before you.  You have the medical records.

23           But her life is completely diminished.  The quality

24    of it is not good.  The predictable length of it is not good.

25    The increased possibility of another stroke goes up every

1    year.

2         So I put at the end of the memo that, you know, that

3    this is someone who has been so apparently publicly taken

4    down, fallen, as a result of -- I mean since she ran these

5    clinics in a bad way, in an illegal way.

6         But I have to say about the clinics, and Mr. Salvan

7    also says, and what the history shows, is there were a lot of

8    people coming, and a lot of this money, and the reports from

9    the DHCS, the state agency that first did the full report,

10   there was a lot of medical care going on that was legal.  So

11   some of the money came from that.

12        And she is going to have to pay back, you will

13   notice, 2 and a half million dollars almost.  She has agreed

14   to do that for the kickback scheme, which is Count 2, but very

15   little of that money either went to her.  It was the

16   inappropriate payments from the guy who was working at the

17   lab, G.A., and some money went to employees at her clinics who

18   were doing work for the labs.

19        But the two and a half million dollars is what was

20   directed to the lab inappropriately because it was initiated

21   by kickbacks.  But real work was done, real medical work was

22   done; it just can't be paid by Medicare because of the

23   kickback involvement.  And she has agreed to pay that back

24   too.

25        So she kept all this money, she had all the

1    properties.  Now she is liquidating the properties.  Now she

2    is helping bankruptcy.

3         You will notice that we have been trying to settle

4    the CID, and there has been no problem with the federal

5    government.  Mr. Tennerelli is actually here, and we have

6    worked with him since the beginning of this.

7         But there was a substantial delay caused by just -- I

8    don't know how to say this, I don't want to demean it -- but

9    going back and forth bureaucratically within the Bureau of

10   Medi-Cal Fraud with the Department of Health Care Services,

11   which is all state stuff, and it's been going on for months.

12        We called in June and said, "Can we start selling

13   these properties?"  She is going to be sentenced eventually,

14   and then she won't be around to effect the settlement.  This

15   summer would have been a great time to sell them for maximum

16   money.  She wants to pay this restitution.  Her husband wants

17   this restitution paid.  They want to make this right.

18        And I think that's extraordinary about this case, the

19   ways they have tried to make this right and continue to,

20   including most recently, a month or so, three weeks ago, we

21   got the final settlement, and the State finally said you can

22   submit it.

23        And we pointed out to them, the Haars made me point

24   out to them that, you know, you are missing three pieces of

25   property that we all knew we could make money off of.  They

1  would be valuable to sell.  I had always assumed that they

2  knew about it because it was all disclosed.  It was all in

3  everything we disclosed to everybody, bankruptcy, criminal

4  court, civil court, but they didn't know about it, so now they

5  are taking that too.

6       But that is a tribute to trying to make it right.

7  What else could they do to make it right?  They have tried

8  everything.

9       You know, I know there is a concern in a case like

10  this, well, the point is, Ms. Bickley puts in her memo, and

11  she is right, crime should not pay.  But ultimately, in this

12  case, crime has not really paid very well, if at all, in what

13  she is ending up with, mostly because of her voluntary desire

14  to pay it back, is little.

15       And what the community sees, all her communities see,

16  is that she is broken.  She has got a weak life that will not

17  last as long as it would have.  She is living on subsistence

18  and will.

19       The deterrence is there.  And all the other factors,

20  we have laid them out, I'm not going to go over them again,

21  are there.  It's how she worked.  She worked so hard to just

22  keep expanding her -- she wanted to keep expanding this.  She

23  got caught up doing it.  I can't explain it entirely.

24  Dr. Mills has to an extent.  Mr. Salvan -- excuse me.

25  Mr. Jenkins, who was raised -- because of his raising, thinks

1   he has some understanding of it, and has explained that to the
2   Court.

3          But now we are finally settling the case today.  On
4   Friday, we were sent the final settlement of the civil case.
5   And we signed it as soon as we saw Ms. Haar and her husband
6   this morning.  We have given it to Mr. Tennerelli.

7          It calls for a period of months to try to liquidate
8   the property as best we can to maximize payment.  They would
9   like to get all of this off them.  They would like to pay
10   everything back, even all the money they didn't get back in
11   the kickback scheme, because it was wrong to have had it paid.

12          She has these medical issues she has to deal with.
13   We believe there is going to be another angiogram, hopefully,
14   in the early part of this coming year.

15          This is serious conduct.  I absolutely understand
16   that there has to be a significant restriction on liberty in
17   addition to the restitution, in addition to any other
18   conditions you deem appropriate.  She is eager for community
19   service, religious service.

20          The people here are two of her daughters, her
21   husband, Mr. Jenkins -- I shouldn't talk away from you --
22   Mr. Jenkins, one of her oldest and dearest friends of 35
23   years, and a lot of her friends that she knows through her
24   faith and her religion, and that is her sustenance.  She,
25   though, does fear tremendously being in prison and away from

1  her doctors.

2      So to continue to settle, to deal with her doctors,

3  if there were a way that custody could be very restrictive,

4  but available to her doctors.  I know it has to be some

5  component of restriction, there has to be some component of

6  incarceration, if you will.

7      But in this particular case, because of all these

8  unusual circumstances, because of who she is, and who she is

9  now, and what she has done to try to make this right, I urge

10  you to consider that and see if there is a way you could

11  fashion a sentence that accommodates it.

12      THE COURT:  Does she wish to be heard?

13      MR. WOLF:  Do you wish to be heard, Ms. Haar, or do

14  you want to stand by your letter you sent to the Judge?

15      THE DEFENDANT:  I want to be heard.

16      THE COURT:  I ask you to speak into the microphone.

17      THE DEFENDANT:  Is it okay I speak to Mrs. Bickley?

18      THE COURT:  You mean address her instead of me?

19      THE DEFENDANT:  Both.

20      THE COURT:  Let me just ask a prefatory question.

21  Are you wanting to say something to her in a negative fashion?

22      THE DEFENDANT:  No, sir.  No, sir.

23      MR. WOLF:  No, your Honor.

24      THE COURT:  All right, then yes.  Go ahead.

25      THE DEFENDANT:  I ask you to forgive me.  I'm sorry.

1   You and your supervisors did a lot of work on this case, and

2   I'm just -- I'm sorry truly from my heart.  I ask you to

3   forgive me.  Doesn't mean you have to, but please forgive me.

4           Is Mr. Tennerelli here?

5           THE COURT:  He is.

6           MR. WOLF:  He is in the front row, back there,

7   Ms. Haar.

8           THE DEFENDANT:  Raise his hand?

9           MR. WOLF:  Do you remember him from a couple years

10  ago, the gentleman with the beard?

11          THE DEFENDANT:  Oh.  The same thing for you, sir.  I

12  know you worked very hard.  The case went on for a very long

13  time.  And it is from my heart, please forgive me.  I

14  apologize to you.  You don't have to, but I'm just saying.

15  Okay?  And your supervisors too, because I know that a lot of

16  people get involved in all the details you have to get into.

17  Thank you.  I appreciate that.

18          To you, sir, to the actual Court, maybe not you

19  personally, because I don't want to offend you in any way.

20          THE COURT:  You are not going to offend me.

21          THE DEFENDANT:  Okay.  I need forgiveness.  From the

22  time -- you have to realize I have got some brain damage so I

23  get all scattered when I talk.

24          But from the time I had the stroke -- and I explained

25  it to Mr. Wolf this morning -- from the time I had the stroke,

1   I was in ICU, in San Francisco.  And it was just like days

2   went by.  And things in my life just, it is like something

3   that happened in the stroke, that thing after thing after

4   thing came up in my mind, it came up in my heart, and the Lord

5   would have me repent for.  Sometimes it was just something I

6   did as a child:  A lie.  I cheated on a test.

7           Anyway, I had been in -- since the days of the stroke

8   when that first happened in ICU, I have been in repentance.

9   Even yesterday.  I am constantly, the Lord will remind me of

10  something else.  And I said, "Lord, okay, thank you."  I need

11  to repent.  I want to be clean.  I want to be right.  I don't

12  want anything behind me.  I want to make things right at every

13  level.

14          And I do believe, because Mr. Wolf and Adam Pennella,

15  they tell me that "Sandy, are you truly repentive?"

16          And I says, "The Lord has forgiven me."  But I'm

17  asking Him, and I am continuing to ask Him to seek my heart

18  and tell me if there is something, is there something else I

19  have not repented for.

20          And He did.  There are things that come up, and I

21  repent for them, and I feel like it's gone, I'm okay, I'm

22  better.

23          So I'm asking for the Court's forgiveness, and you,

24  if it's okay, if it doesn't offend you.

25          He basically covered everything, but if the Court

1   doesn't think that I haven't suffered for what I have done, I

2   have.  I have suffered every single day.  Every day.

3          Because it's the brain damage that happened, and my

4   prayer was, Lord, just let all this be over soon because my

5   brain just needs to heal.  I just want to heal.  And I

6   couldn't heal because not only did I have all these different

7   legal things going on, I had a whole bunch of employee

8   lawsuits.  They saw opportunities to sue, and they started

9   suing.  I had to handle all that.

10          My brain hasn't had an opportunity to heal.  And I

11   just want to heal.  I have lost my health.  We were living in

12   a larger home.  We considered it our retirement home because

13   it was one story, you know.

14          We knew we needed to make things right, and give up

15   everything.  I told my husband, "Let's move back to one of our

16   smaller rentals."

17          And he said, "Let's do that."

18          We call it the "red barn."  It is the house we raised

19   our kids in.  We instantly put our house on the market, and it

20   sold really fast.  And we moved, and we were back in the

21   house.

22          And Ms. Bickley has agreed to let us keep our home.

23   So I lost the home I was living in, and I'm now in a two-story

24   house, which is not easy to get around in, but I'm okay with

25   that.

1          You see my husband behind me.  I see my husband

2     suffer.  He is down to 110 pounds because he can't handle the

3     stress of all this.  It is not that he thinks he is going to

4     get in trouble; it's because he knows if I go to prison, the

5     possibility of me dying is more likely than not because the

6     aspiration thing.

7          I don't know if he went over the aspiration thing.

8     Couple years ago, three times in one year, I aspirated in my

9     sleep to the point I had to use a epi pen.  So I have to be in

10    a hospital bed.  In my house, I'm in a hospital bed.  It is

11    not legal, a hospital bed.  It's one of those beds, I have a

12    side rail and the head goes up, the electric things.

13         And he knows if I'm put somewhere flat, the first

14    night, I could die because I can't.  It is not because -- it

15    is not -- it's not food I'm aspirating on.  It's just any

16    liquid, any secretions whatsoever come up when I aspirate, and

17    it goes in my lungs, and I can't breathe, and I shut down.

18         I lost my license.  I'm losing every single property

19    but the house we live in.  I lost my finances.

20         I feel like I need to keep my doctors.  The guy, he

21    talks about the angiogram.  It is actually brain surgery.

22    They go into my right groin --

23         THE COURT:  I'm familiar with the procedure.

24         THE DEFENDANT:  It goes in my brain.  And it was due

25    already, but we didn't have insurance to pay for it.  Now the

1   Medicare card will be in the mail any day.  I need a hospital

2   bed.  I need the brain surgeries.

3        I think he covered everything else.  He talked about

4   community service.

5        Just this is the last thing I'm going to say.  The

6   last thing I'm going to say.  My spiritual mom, little old

7   Black lady.  She went into a coma this last year, and I found

8   a way to get over to the nursing home to see her a couple of

9   times.  And I took my grandbabies with me, and we would go.

10  And she was in a coma.  And I just knew I just had to lay

11  hands and pray for her.

12       And me and the little grandbabies, they are eight and

13  nine years old, and we prayed for them -- prayed for her.

14  And then she don't respond because we know she is in a coma,

15  but we still, we did our due diligence.  We did from our heart

16  what we needed to do because I know the Lord is getting ready

17  to take her home pretty soon.

18       As we go out the door, they have the activities room,

19  and the activities room is full of old people.  They are

20  playing some little bingo stuff.  And I asked the activities

21  director, "Can I interrupt you?"  And she let me.

22       And I said, "We just prayed for Sister Dorothy."  I

23  says, "Anybody here need prayer?"  Their hands went up

24  everywhere.  And me and my two little grandbabies prayed for

25  so many little old people.  And they wept and they cried, and

1 | these old people, they need prayer.  They need people that
2 | believe in God.

3 |     And we are not there to change their religion, but
4 | they need hope.  When someone prays for them, it gives them
5 | hope that they are going to get better.  It reminds them that
6 | they can call on God themselves.

7 |     So that's what I want.  If you have to -- if you
8 | could possibly give me community service, I would go into
9 | those nursing homes every day I possibly could and minister to
10 | these people.  I would do that.  Because these people need it.
11 | And it blessed me and it blessed my grandbabies.

12 |     I don't think I have anything else to say, other than
13 | forgive me, sir.  Thank you.  Thank you.

14 |     THE COURT:  Okay.

15 |     THE DEFENDANT:  I'm sorry I talked so long.

16 |     THE COURT:  Does the government wish to be heard?

17 |     MS. BICKLEY:  Definitely, your Honor.  Your Honor,
18 | Ms. Haar is just lying to you.  She says that she was
19 | repentant from her hospital bed after the stroke, but what did
20 | she do?  She didn't contact authorities about her fraud.

21 |     What she did was she continued her fraud.  She
22 | reached out to the person who was paying her thousands of
23 | dollars in cash in kickback payments and told him that he
24 | needed to keep them confidential.  She was continuing her
25 | crimes after her stroke.

1      She now uses all of those ailments as an excuse that

2   she shouldn't go to jail.  Many of those ailments she had

3   during the course of her fraud.  They should not now be her

4   get-out-of-jail card, your Honor.

5      Ms. Haar is an educated, capable woman.  She enriched

6   herself by millions of dollars.  That's not the $6 million

7   that was in the Horisons bank account, it is millions of other

8   dollars that she and her family took from this organization.

9      Her greed came at a cost to her patients.  For

10  example, she got patients addicted to opioids in order to

11  enrich herself.  That's appalling conduct.

12     No matter what she says, the defendant is no better

13  than any other drug pusher that you have seen in this

14  courtroom who is getting people addicted to drugs in order to

15  enrich herself at the expense of their health and at the

16  expense of the safety of others.  Her conduct continued day

17  after day, month after month, year after year, including after

18  that stroke.

19     Lying and cheating were just a way of life for this

20  defendant.  This is not some one-off fraud or some aberration,

21  but rather, who this person is.

22     Ms. Haar seems to be arguing that her fraud was a

23  bureaucrat oversight.  I believe the expert from North

24  Carolina that she hired called it, you know, a form of

25  "administrative untidiness."

1          She was instructing people to fake dates, to bill for

2     services that were not rendered.  She was getting patients

3     addicted to opioids in order to enrich herself.  She was

4     telling people to hide things from auditors.  She knew exactly

5     what she was doing, and she never self-reported it.  She was

6     hurting people based on her own greed.

7          She also writes and sits in this courtroom and seems

8     to be using God and religion once again to get away with her

9     crime.  That is appalling.  She used religion in order to

10    commit this crime to enrich herself by millions of dollars.

11    She named her instrument of her crime "Horisons" after Jesus,

12    I assume.

13         The kickback payments, those cash payments that she

14    was receiving illegally from Gary Arouchian, those she called

15    a donation to the church.  Where did those thousands of

16    dollars go?  Not to the church.  They went into her own

17    pocket.  She was using God and religion to commit crime.

18         Now, God didn't make her commit those crimes.  Her

19    own greed did.  And God and religion should not be the excuse

20    that she gets to use in order to get away with paying for

21    those crimes.

22         You know, she also argues that she was trying to help

23    the needy with respect to Horisons.  She wasn't helping the

24    poor; she was preying upon them.

25         Note that among all the letters your Honor mentioned,

1   not one of those letters was from a patient.  Patient after

2   patient complained that Horisons was a scam, that they had to

3   keep going back, that they were owned by Ms. Haar and

4   Horisons.

5           Patient after patient talked about how they had to

6   be -- that they were given opioids, and were forced to come

7   back for more and more drugs.

8           That's not helping people.  Patients have suffered

9   from this fraud.

10          You know, she also points to her efforts with

11  Bankruptcy Trustee.  However, this Court should not look to

12  those efforts.  She is using the ill-gotten gains of her fraud

13  to try to get out of going to jail.  That is just not right,

14  and inappropriate.

15          This was an egregious crime in which Ms. Haar caused

16  significant damage to people and her employees and millions of

17  dollars of loss to the Medi-Cal and Medicare programs.

18          You know, Mr. Wolf mentioned crime should not pay.

19  Given the nature and circumstances of the defendant's

20  offenses, her characteristics, who the true Ms. Haar is, which

21  you can see when you look at what the -- her patients say, and

22  what her employees have said, the seriousness of this offense,

23  and the need to promote and respect for the law, Ms. Haar

24  deserves a sentence of 78 months in jail, your Honor.  And we

25  ask that that be her sentence.

1          THE COURT:  Anything further?

2          MR. WOLF:  Wow.  I know that many people, you can

3     just tell -- and Salvan says it, the Trustee in bankruptcy,

4     that they researched it and found that people were being

5     helped, and now there is a loss there.  People came back.  I

6     know some people were mistreated, or they are saying they

7     were.  I haven't seen any medical records of what's being

8     taken from apocryphal anonymous names.

9          I'm not saying that what she did was right.  And the

10    thing that really takes me back is -- I don't know how much

11    time Ms. Bickley has spent with Ms. Haar, her family, the

12    people around her -- but her religion is real, and it wasn't

13    an excuse.

14         To say that we tried to present this as an excuse, we

15    tried to contextualize it.  To the contrary.  The way you see

16    throughout everyone talking about mistakes or administrative

17    mistakes, oversights, it is the way she was seeing it because

18    she was rushing forward so much.  It wasn't right.  She now

19    knows it wasn't right.  She didn't know then, which is why it

20    went on for so long.

21         I do have to say, Ms. Haar's faith is real.  What she

22    did was wrong.  Who she is is before you.  What we tried to

23    say about the fraud was that it was unusual that so much of

24    the money taken, either whether it was from the legally built

25    stuff or the illegally built stuff, was still there.  It was

1　the lack of a lavish lifestyle, it was the lack of just

2　letting the money go.  It is there to help pay it back.  That,

3　I see, is unusual from my experience.

4　　　　　And I do think under the law and under the facts, it

5　does make argument for a variance, and I urge you to vary much

6　lower than 78 months, your Honor.

7　　　　　THE COURT:  Anything further?

8　　　　　MS. BICKLEY:  No, your Honor.

9　　　　　THE COURT:  It is not up to the Court to forgive.

10　That's not my job.  That's a different type of a judge.  And

11　the faith belief, the religious belief issues are, I'm not an

12　intervenor in that regard.  That's up between you or any other

13　person, any other human being, and the ultimate Judge.

14　　　　　My job is different.  My job is to deal with that

15　which comes before me under the law and to react to it in a

16　manner that I feel is fair based on what the law is, based on

17　what the facts are.

18　　　　　I don't have the luxury that some people think I

19　have, and that is to only look at somebody who is before me as

20　a defendant during sentencing.

21　　　　　My obligation is higher and broader than that, and

22　that is that I have an obligation not just to the

23　Constitution, and not just to the defendant who is before me,

24　not just to the statutes, but also to victims.  And that's an

25　obligation that is real to any judge.

1       Therefore, in finding that the appropriate applicable

2   offense level is 21, History Category is I, guideline range is

3   78 to 97 months, pursuant to the Sentencing Reform Act of

4   1984, and considering the 3553(a) factors, including on both

5   sides, victims' side, and on medical side having to do with

6   the defendant, because there is no question that there has

7   been a serious stroke that has been -- that has occurred here,

8   pursuant to the Sentencing Reform Act of 1984, it is the

9   judgment of the Court that as to each Count 1 and Count 2, you

10  are committed to the custody of the Bureau of Prisons for a

11  term of 60 months.

12      You shall pay a special assessment of $200, payment

13  to begin immediately.  Each Count 1 and Count 2 is to run

14  concurrently, for a total of 60.

15      The Court does find you do not have the ability to

16  pay a fine, and that's waived.  You shall pay the special

17  assessment of $200, payment to begin immediately, because that

18  is not optional, that is mandatory.

19      You shall also pay restitution to the victims in the

20  amount as stated on page 25 of the PSR, as outlined in the

21  Restitution Attachment to the Presentence Report.  And

22  restitution is to be sent to the Clerk of the Court, who shall

23  forward it to the victims.

24      While incarcerated, payment of restitution is due

25  during imprisonment at a rate not less $25 per quarter, and

1    payment shall be made through the Bureau of Prisons Inmate

2    Financial Responsibility Program.  Interest is waived.

3         Upon release from imprisonment, you shall be placed

4    on supervised release for a term of 36 months on each Counts 1

5    and 2, to be served concurrently, for a total of 36.

6         Within 72 hours of release from the custody of the

7    Bureau of Prisons, you shall report in person to Probation in

8    the District where you are released.

9         While on release, you shall not commit another

10   federal, state, or local crime; not illegally possess

11   controlled substances; shall make restitution pursuant to

12   18 United States Code sections 3663 and (a), or any other

13   statute authorizing a sentence of restitution; shall cooperate

14   in the collection of DNA, as directed by Probation; shall

15   comply with the standard conditions recommended by the

16   Sentencing Commission and adopted by the Court; shall refrain

17   from any unlawful use of any controlled substances; shall

18   submit to one drug test within 15 days of release from

19   imprisonment, and at least two thereafter, not to exceed four

20   per month.

21        The Court is going to order the 11 Special

22   Conditions, which I can read or incorporate by reference.

23        MR. WOLF:  I'm satisfied with incorporating by

24   reference.  We have read them, and so has she.

25        MS. BICKLEY:  That's fine, your Honor.

1          THE COURT:  Done and ordered.

2          Is there a request geographically?

3          MR. WOLF:  There is a little more than that, your

4   Honor, if I might.  We consulted with people who know about

5   Bureau of Prisons, and what's been recommended to us is --

6   well, we are hoping that there will be a surrender.

7          And what I'm told to ask for is that you request that

8   the Bureau of Prisons conduct a medical designation of the

9   defendant.  We don't know where it is best for her to go.

10  They will, if you say those words.  It is supposed to be in

11  the J and C right after the language, "is committed to the

12  custody of the Bureau of Prisons for a term of," and you said

13  60 months.

14         We have a medical records packet that we have given

15  to Probation, we have given to the prosecutor, and we have for

16  the Court as well, that they can send it along.  The USPO can

17  prepare it and send it to BOP, because it has to go to the

18  Office of Medical Designator.

19         This is all, your Honor, because I don't know enough

20  medically, and I don't want to be a part of putting her

21  someplace where she could be in some danger.  I don't know

22  well enough.

23         And I know that Bureau of Prisons will be able to

24  deal in some fashion.  I don't know how.

25         But the other thing I'm urged to ask you is rather

1   than a Friday, at 2:00 o'clock surrender, that someone with

2   these kind of medical issues should be told go to a prison by

3   10:00 o'clock, on a Tuesday or Wednesday.  She also has the

4   responsibility to bring all her medications so they take them

5   and try to replace them as quickly as possible.

6        This is all just to honor what I do believe are

7   serious medical issues, a stroke, and I have no reason not to

8   be concerned by the gastric reflux.

9        THE COURT:  The Court will certainly indicate in the

10  judgment that there is a serious medical condition that needs

11  to be evaluated by the Bureau of Prisons, and that based on

12  their evaluation, the most effective, the most medically

13  effective location is where she should be housed.

14        MR. WOLF:  I will say that we did check, and right

15  now, there is a very good doctor and medical staff at Dublin,

16  which would, of course, make it possible for her children and

17  her husband and her grandchildren, her family, these friends

18  to have her somewhere nearby.

19        The problem is that we have been told that there

20  can't be a hospital bed there, that there might be a wedge

21  that will lift her fairly quickly.

22        THE COURT:  Again, that's not my area of expertise,

23  and so have to leave it up to the medical team at the Bureau

24  of Prisons to make that determination of where she should be

25  housed.

1          MR. WOLF:  Thank you, Mr. Pennella.

2          I did hear, your Honor.  I'm sorry.  I was distracted

3     for one second.

4          There is two other matters.  One is the probation

5     report does recommend RDAP because of her becoming addicted to

6     benzodiazepines as a result of treatment after the stroke, and

7     we would ask you to make a recommendation for RDAP at an

8     appropriate time and an appropriate facility for that.  I

9     think most of the medical facilities have it.

10         THE COURT:  Done.

11         MR. WOLF:  The final thing, your Honor, and this is a

12     little more complicated, and Ms. Bickley urged me to make sure

13     I told you about this.

14         In the plea agreement, under Restitution, on page 3,

15     we did agree that any money that does flow -- and you saw

16     Mr. Salvan's letter, you saw her memo, there should be over $2

17     million flowing to the two victims, the State and Federal

18     Administrators of Medicare.  And that we would get -- she

19     would get an offset to her restitution order you just made

20     based on that.  And Ms. Bickley told me that she thinks it

21     should be reflected in your judgment and commitment.

22         And we finally signed the civil agreement today, that

23     there are a list of properties that will eventually be sold.

24     She will have to give a power of attorney to her husband to

25     maximize that recovery, but that also should be a setoff,

1  because they don't have $6 million, of course, or anywhere
2  near it, or never will have in this lifetime.

3          So we did want to try to get those.  And I need to
4  confer with someone or with your staff to figure out how to
5  make sure that that setoff occurs.

6          I didn't think of it.  Ms. Bickley said it should be
7  in some form in the judgment and commitment.

8          MS. BICKLEY:  Well, your Honor, it is reflected in
9  paragraph 112 of the PSR, that the restitution can be offset,
10  so perhaps if you wanted to incorporate that.

11          THE COURT:  I do incorporate that.  The intent is,
12  obviously, under the law, is that any amounts that are paid
13  toward restitution be included in any setoff.  And there is no
14  reason for it not to be, and so the Court does incorporate
15  that paragraph in its judgment.

16          MS. BICKLEY:  And the other issue that I wanted to
17  raise is I believe that your Honor misspoke in talking about
18  the total offense level.  It is not 21.  It is 28.

19          THE COURT:  If I said "21," I was looking at 28 and
20  said 21.

21          MS. BICKLEY:  Thank you.

22          THE COURT:  It is 28.  I agree with that.

23          MS. BICKLEY:  Thank you, your Honor.

24          THE COURT:  Okay.

25          MR. WOLF:  Your Honor, then neither Probation nor the

1    prosecution opposes a self-surrender date.  And I would ask

2    for a Tuesday or Wednesday, if at all possible, to a date

3    where she could have had this one last angiogram to see if

4    that really has closed up.  We don't have a date yet.  We

5    think it is going to be in January.

6                THE COURT:  Understood.

7                THE DEFENDANT:  Can I talk?

8                THE COURT:  With your lawyer.

9          (Counsel and the defendant conferred off the record.)

10               MR. WOLF:  She wants me to urge you again, Judge,

11   that it be local confinement so she can have her doctors

12   nearby, and I told her what the nature of your sentence is.

13               THE DEFENDANT:  The halfway house.

14               THE COURT:  I understand.  I have considered the

15   requests, and the judgment is what it is.

16               It is further ordered that having been sentenced to

17   the custody of the Bureau of Prisons, you shall surrender to

18   the institution designated by the Bureau of Prisons, or if no

19   such institution has been designated, to the United States

20   Marshal, in Fresno, California, before 2:00 p.m. -- and

21   because of the apparent medical test that seems not only

22   appropriate but of consequence, the Court is going to make the

23   date January 15, 2020, a Wednesday.

24               You are further advised that it is a criminal offense

25   punishable by a consecutive term of imprisonment to fail to

1 | surrender for service of sentence pursuant to the order of

2 | this Court.

3 | Was there an indictment in this case?

4 | MS. BICKLEY:  No, your Honor.  She pled to an

5 | information that had two counts.

6 | THE COURT:  All right.  And appellate rights have

7 | been waived.

8 | Is there anything else?

9 | MR. WOLF:  I have nothing, your Honor.  Thank you.

10 | MS. BICKLEY:  No, your Honor.

11 | THE COURT:  That's the order of the Court.

12 | MS. BICKLEY:  Thank you.

13 | (The proceedings were concluded at 12:07 p.m.)

14 | I, PEGGY J. CRAWFORD, Official Reporter, do hereby

15 | certify the foregoing transcript as true and correct.

16 |

17 | Dated:  4th of December, 2019      /s/ Peggy J. Crawford
                                      PEGGY J. CRAWFORD, RDR-CRR

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |