1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,              No.  1:18-cr-00155-NONE

12                  Plaintiff,

13         v.                                 ORDER DENYING MOTION FOR
                                              COMPASSIONATE RELEASE
14    SANDRA HAAR,
                                              (Doc. No. 30)
15                  Defendant.

16

17         Pending before the court is defendant Sandra Haar's motion for compassionate release

18    pursuant to 18 U.S.C. § 3582(c)(1)(A).  The motion is largely based on defendant's medical

19    condition and the risks purportedly posed to her by the ongoing coronavirus ("COVID-19")

20    outbreak.  (Doc. No. 30 at 1.)  For the reasons explained below, defendant's motion will be

21    denied.

22                                   **BACKGROUND**

23         On July 13, 2018, defendant Haar pleaded guilty to committing healthcare fraud in

24    violation of 18 U.S.C. § 1347 and conspiracy to receive kickbacks in violation of 18 U.S.C.

25    § 371.  (Doc. No. 2 at 2.)  On November 4, 2019, she was sentenced to the custody of the U.S.

26    Bureau of Prisons ("BOP") for a sixty month term of imprisonment on both counts, to be

27    followed by a 36-month term of supervised release on both counts, with those sentences to be

28    served concurrently.  (Doc. Nos. 22; 25 at 2.)  The court also ordered the defendant to pay

1

1  restitution in the amount of $6,107,846.85 and imposed the mandatory $200 special assessment.

2  (*Id*.)  Defendant Haar was granted a voluntary surrender date of January 15, 2020 and it was

3  recommended by the sentencing judge that, due to her serious medical condition, the BOP

4  provide her a medical priority designation.  (*Id*.)  Defendant is currently serving her sentence at

5  the BOP Federal Medical Center at Carswell in Fort Worth, Texas ("FMC Carswell").  (Doc. No.

6  30 at 2.)

7        On April 6, 2020, after defendant had served less than 3 months of her 60-month sentence,

8  counsel on her behalf filed the pending motion for modification of her sentence pursuant to 18

9  U.S.C. § 3582(c)(1)(A).  (Doc. No. 30.)  On April 13, 2020, the government filed its opposition to

10  the motion, and on April 28, 2020, defendant filed her reply thereto.  (Doc. Nos. 33, 36.)  The

11  parties have submitted various filings thereafter.  (Doc. Nos. 38, 39, 41.)  In addition, on July 27,

12  2020, the court received a letter from defendant Haar directly, even though she is represented by

13  counsel in these proceedings, in which she seeks her release to home confinement and makes a

14  number of representations regarding her case, her medical condition and the conditions of her

15  confinement.

16                                              **LEGAL STANDARD**

17        A court generally "may not modify a term of imprisonment once it has been imposed."  18

18  U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of

19  conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not

20  be modified by a district court except in limited circumstances.").  Those limited circumstances

21  include compassionate release in extraordinary cases.  *See United States v. Holden*, __ F. Supp.

22  3d __, 2020 WL 1673440, at *2 (D. Or. April 6, 2020).  Prior to the enactment of the First Step

23  Act of 2018 ("the FSA"), motions for compassionate release could only be filed by the BOP.  18

24  U.S.C. § 3582(c)(1)(A) (2002).  Under the FSA, however, imprisoned defendants may now bring

25  their own motions for compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A)

26  (2018).  In this regard, the FSA specifically provides that a court may

27  /////

28  /////

upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[1] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –

(i)     extraordinary and compelling reasons warrant such a reduction; or

(ii)    the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[2]

---

[1] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the Regional Director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

[2] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of*

1    The applicable policy statement with respect to compassionate release in the U.S.

2 Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and

3 compelling reasons."  U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[3]; *see also*

4 *United States v. Gonzalez*, No. 2:18-cr-00232-TOR, 2020 WL 1536155, at *2 (E.D. Wash. Mar.

5 31, 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary

6 and compelling reasons," even though that policy statement was issued before Congress passed

7 the FSA and authorized defendants to file compassionate release motions).  However, a large and

8 growing number of district courts across the country have concluded that because the Sentencing

9 Commission has not amended the Guidelines since the enactment of the FSA, courts are not

10 limited by the pre-FSA categories described in U.S.S.G. § 1B1.13 in assessing whether

11 extraordinary and compelling circumstances are presented justifying a reduction of sentence

12 under 18 U.S.C. § 3582(c).  *See, e.g.*, *United States v. Parker*, __ F. Supp.3d __, 2020 WL

13 2572525, at *8–9 (C.D. Cal. May 21, 2020) (collecting cases); *United States v. Rodriguez*, 424 F.

14 Supp. 3d 674, 681 (N.D. Cal. 2019).

15    In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the

16 defendant bore the initial burden of demonstrating that a sentence reduction was warranted.  *See*

17 *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

18 has not specifically addressed the question of which party bears the burden in the context of a

19 motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts

20 ──────────────────────

21 *Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020).  The BOP has
acted on the Attorney General's guidance, including one case in which a sentenced prisoner was

22 released to home confinement after serving less than half his sentence from a facility that reported
no positive COVID-19 cases at the time of his release.  *See* Hannah Albarazi, *Paul Manafort*

23 *Seeks Prison Release Over COVID-19 Fears*, Law360 (Apr. 14, 2020), https://www.law360.
com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the

24 prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release
prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid*

25 *COVID-19 Fears*, Law360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-

26 manafort-released-from-prison-amid-covid-19-fears.

27 [3]  The Sentencing Guidelines also require that to be granted a reduction of sentence under 18
U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person

28 or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

1    that have done so have agreed that the burden remains with the defendant.  *See, e.g.*, *United*

2    *States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020);

3    *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, at *3 (W.D. Wash. May 7,

4    2020).

5                                              **ANALYSIS**

6           As district courts have summarized, in analyzing whether a defendant is entitled to

7    compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a

8    defendant has satisfied three requirements:

9               First, as a threshold matter, the statute requires defendants to exhaust
                administrative remedies.  18 U.S.C. § 3582(c)(1)(A).  Second, a
10              district court may grant compassionate release only if "extraordinary
                and compelling reasons warrant such a reduction" and "that such
11              reduction is consistent with applicable policy statements issued by
                the Sentencing Commission.  *Id.*  Third, the district court must also
12              consider "the factors set forth in Section 3553(a) to the extent that
                they are applicable."  *Id.*
13

14   *Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-CR-00124-

15   LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 2020 WL 2572525, at *4;

16   *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9,

17   2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be

18   "consistent with" the sentencing factors set forth in §3553(a)).

19   **A.      Administrative Exhaustion**

20          In the pending motion, defendant does not discuss whether she exhausted her

21   administrative remedies as required by the FSA.  (*See passim* Doc. No. 30.)  In her reply in

22   support of the pending motion, defendant's counsel argues in conclusory fashion that exhaustion

23   is not required for this compassionate release motion because defendant is moving for her release

24   based on grounds not requiring exhaustion of administrative remedies.  (Doc. No. 36 at 6.)

25   Nonetheless, in its supplemental opposition filed May 20, 2020, the government reports that

26   defendant did submit a request for compassionate release on March 27, 2020, which was denied

27   by the Warden at her institution of confinement on April 9, 2020, and takes the position that "this

28   Court may reach the merits of her motion for compassionate release."  (Doc. No. 41 at 1–2; *see*

                                                    5

1 | *also* 41-1, Exs. 1 & 2.)[4]  Accordingly, the court will address the merits of the pending motion.

2 | **B.      Extraordinary and Compelling Reasons**

3 | "Extraordinary and compelling reasons" warranting compassionate release may exist

4 | based on a defendant's medical conditions, age and other related factors, family circumstances, or

5 | "other reasons."  U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all of "other

6 | reasons" was included in the policy statement at a time when only BOP could bring a

7 | compassionate release motion, courts have agreed that it may be relied upon by defendants

8 | bringing their own motions under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-236-

9 | JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

10 | Thus, the medical condition of a defendant may warrant compassionate release where he

11 | or she "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life

12 | trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a

13 | specific time period) is not required."  U.S.S.G. § 1B1.13, cmt. n.1 (A)(i).  Non-exhaustive

14 | examples of terminal illnesses that may warrant a compassionate release "include metastatic

15 | solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced

16 | dementia."  *Id.*  In addition to terminal illnesses, a defendant's debilitating physical or mental

17 | condition may warrant compassionate release, including when:

18 | The defendant is

19 | (I)   suffering from a serious physical or medical condition,

20 | (II)  suffering from a serious functional or cognitive impairment, or

21 | (III) experiencing deteriorating physical or mental health because of
22 | the aging process,

23 | that substantially diminishes the ability of the defendant to provide
self-care within the environment of a correctional facility and from
24 | which he or she is not expected to recover.

25 | *Id.* at cmt. n.1 (A)(ii).  Where a defendant has moderate medical issues that otherwise might not

26 |

27 | ──────────────
[4]  The court notes that defendant Haar has made no mention of an appeal from that denial to the
BOP's Regional Director having been pursued as required under 28 C.F.R. § 542.15(a).  *See*
28 | *supra* note 1.  Nonetheless the court will address the pending motion on its merits.

1   be sufficient to warrant compassionate release under ordinary circumstances, some courts have

2   concluded that the risks posed by COVID-19 tips the scale in favor of release in particular

3   situations.  *See, e.g.*, *United States v. Rodriguez*, No. 2:03-cr-00271-AB, 2020 WL 1627331 at

4   *10–11 (E.D. Pa. Apr. 1, 2020) ("Without the COVID-19 pandemic—an undeniably

5   extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and

6   rehabilitation would not present extraordinary and compelling reasons to reduce his sentence.

7   But taken together, they warrant reducing his sentence.").

8         Compassionate release may also be warranted based on a defendant's age and other

9   related factors.  In these situations, "extraordinary and compelling reasons" exist where a

10   "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or

11   mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of

12   his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13, cmt. n.1 (B).  In

13   determining a defendant's projected release date, courts may take into account any "good time

14   credits" awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in 18

15   U.S.C. § 3624(b)(1).  *See, e.g.*, *United States v. Burrill*, No. 17-cr-00491-RS, 2020 WL 1846788,

16   at *1 n.1 (N.D. Cal. Apr. 10, 2020).

17         Here, defendant Haar argues that extraordinary and compelling reasons warranting her

18   compassionate release exist due to her medical conditions.  (*See* Doc. No. 30 at 6–7.)  Defendant

19   just turned 60 years old and she suffered a stroke in 2016 (before she was sentenced in this case)

20   as a result of a brain arteriovenous malformation (a tangling of blood vessels in the brain).  (*Id.*;

21   Doc. No. 14 (Presentence Report) at 15–16.)  In August of 2017, she had stereotactic radiosurgery

22   to address that condition with what was reported as generally good neurological results.  (*Id.*)

23   Yearly angiograms were recommended to confirm the success of that procedure, the first two of

24   which the defendant received, but she was unable to do so in August of 2019 due to lack of

25   medical insurance.  (*Id.*; *see also* Doc. No. 18 (Defense Sentencing Memorandum) at 20–21.)  If

26   an angiogram determined that the blood vessels in her brain had not closed off completely, brain

27   surgery would be required because it is not medically advisable for her to have another round of

28   radiation in that area.  (*Id.*)  Lastly, defendant Haar suffers from severe gastrointestinal reflux

1   which requires her to sleep in an elevated position, which is possible in a hospital bed, in order to

2   avoid aspiration.  (*Id.*; Presentence Report at 14.)[5]

3         According to the U.S. Centers for Disease Control and Prevention ("CDC"), defendant

4   Haar is at higher risk for becoming severely ill were she to contract COVID-19 because of her

5   age and she "may" be at higher risk due to her stroke in 2016 which was suffered as the result of,

6   or caused by, a "cerebrovascular disease."  *See Coronavirus Disease 2019 (COVID-19): People*

7   *Who Are at Increased Risk for Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

8   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-

9   risk.html (last visited Aug. 24, 2020).  As recently as April 22, 2020, however, a BOP physician

10   noted that a review of defendant's angiogram in March 2020 "revealed [an] almost complete

11   elimination of the [arteriovenous] malformation."  (Doc. No. 41-1, Exh. 4 at pp. 10, 24(sealed).)

12   Defendant's other medical conditions are not identified by the CDC as placing her at higher risk

13   of suffering a severe illness due to COVID-19.  Nonetheless, to the extent defendant seeks her

14   compassionate release based upon the risks posed to her by COVID-19, her motion falls short.  It

15   is apparent that FMC Carswell suffered a significant COVID-19 outbreak with 539 prisoners

16   there having tested positive for the virus out of 1,296 tests administered and five prisoners having

17   died at the hands of the virus.  *See COVID-19*, FEDERAL BUREAU OF PRISONS,

18   https://www.bop.gov/coronavirus/ (last visited August 25, 2020).  As of today, however, that

19   facility is reporting only ten inmates currently with positive tests for COVID-19 and 527

20   recovered inmate cases.  *Id.*[6]

21   /////

22

23   [5]  Defendant's current counsel characterizes this as a respiratory issue and also asserts, without
     support, that defendant Haar "needs brain surgery imminently."  (Doc. No. 30 at 3.)  It may be

24   that defense counsel is referring not to surgery but to the yearly angiogram for at least three years
     which the defendant had performed twice but did not obtain the third before going into custody

25   due to her lack of health insurance.  (*Id.* at 7.)

26
     [6]  The undersigned does not necessarily accept these reported numbers at face value given the

27   manner in which the CDC guidelines apparently allow for individuals to be counted as recovered
     from the virus without confirming test results.  However, there is also no evidence before the

28   court contradicting those reported numbers.

1    Still, there is no doubt in the court's view that defendant Haar has and is "suffering from a

2    serious physical . . . condition . . . from which . . . she is not expected to recover."  *See* U.S.S.G. §

3    1B1.13, cmt. n.1 (A)(ii).  However, the question posed by the pending motion for compassionate

4    release is whether defendant's condition "substantially diminishes" her ability "to provide self-

5    care" at FMC Carswell.  *Id.*

6            In this regard, defendant Haar has failed to carry her burden of demonstrating that she is

7    not able to provide for her self-care at FMC Carswell, a BOP medical facility.  In her motion

8    defendant argues, for example, that she "could suffocate in her sleep without proper

9    accommodations in bed, even while otherwise healthy"—but the motion does not provide any

10   support for defendant's bare assertion that she is not receiving proper accommodation in that

11   regard.  (Doc. No. 30 at 8.)  Other than the additional risk posed by the spread of the COVID-19

12   virus, all of defendant's medical conditions, including her serious neurological condition, were

13   well known to the sentencing judge, having been extensively briefed and argued by defendant's

14   very able former counsel.  (*See* Doc. Nos. 18; 27 at 4–19.)  The sentencing judge took that serious

15   medical condition into full account less than nine months ago when he varied downward from the

16   low end of the guideline range to a sentence of 60 months and recommended, at the defense's

17   request, that the BOP conduct a medical designation of the defendant.  (Doc. No. 27 at 27–28.)  In

18   short, none of the medical conditions upon which defendant Haar relies in moving for release are

19   new, nor is there any evidence that her conditions have grown worse or more serious in the short

20   time since her sentencing.  And, as the government notes, to the extent defendant is attempting to

21   assert a claim that her conditions of confinement violate her rights under the Eighth Amendment,

22   a motion for compassionate release in this court is not the appropriate vehicle by which to do so.

23   (*See* Doc. No. 33 at 23 n.4.)

24           The court concludes that defendant has not met her burden of demonstrating extraordinary

25   and compelling reasons for compassionate release under § 3582(c)(1)(A).  Accordingly, and in

26   light of that conclusion, her motion will be denied.

27   /////

28   /////

9

1

## C.      Consistency With the § 3553(a) Factors

2        Even if defendant Haar's motion was supported by a showing of extraordinary and

3 compelling reasons for her compassionate release, however, the undersigned is not persuaded that

4 the requested reduction in sentence would be consistent with consideration of the sentencing

5 factors set forth at 18 U.S.C. § 3553(a).[7]  *See Parker*, 2020 WL 2572525, at \*11.

6        Defendant's motion does not discuss the sentencing factors set forth in § 3553(a), except

7 for stating in conclusory fashion that she "is not a danger to her community."  (Doc. No. 30 at

8 13.)  This is plainly insufficient.

9        Defendant Haar's fraudulent conduct that resulted in her convictions was egregious.  She

10 was a licensed nurse practitioner and the founder and chief executive officer of a purported

11 nonprofit public benefit corporation (Horisons) that provided health and dental services for the

12 underserved through a network of eight clinics throughout the Central Valley of California.  (Doc.

13 No. 14 (Presentence Report) at 4.)  Operating Horisons, defendant Haar engaged in an extensive

14 healthcare fraud scheme starting in January of 2014 until at least March of 2017 by charging

15 Medi-Cal and Medicare patients for services that either were not rendered, were unnecessary, or

16 that she otherwise knew were not reimbursable and she profited by nearly $4 million as a result.

17 (*Id.* at 5–8.)  She also engaged in a separate conspiracy during that three-year period to receive

18 kickbacks by referring her patients to a medical laboratory testing company in exchange for cash

19 payments of approximately $1,000 a month, delivered to her in envelopes and which she used as

20 "spending money."  (*Id.* at 8.)  That medical laboratory testing company billed over $9 million to

21

22 [7] Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court
shall consider:  the nature and circumstances of the offense and the history and characteristics of
23 the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote
respect for the law, provide just punishment for the offense, afford adequate deterrence, protect
24 the public from further crimes of the defendant and provide the defendant with needed
educational or vocational training, medical care, or other correctional treatment in the most
25 effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range
established for the applicable category of offense committed by the applicable category of
26 defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing
Commission; the need to avoid unwarranted sentence disparities among defendants with similar
27 records who have been found guilty of similar conduct; and the need to provide restitution to any
victims of the offense.

28

1  Medi-Cal and Medicare in fees associated with patients referred by defendant and it is estimated

2  that Medi-Cal and Medicare lost at least $6 million dollars as a result of defendant Haar's illegal

3  conduct.  (*Id.* at 8–9.)   Moreover, defendant Haar also involved others, including family

4  members, in her fraudulent conduct.  (*Id.* at 4.)  Finally, the already underserved patients of

5  Horisons suffered harm as a result of receiving treatment from unlicensed individuals, often with

6  serious consequences to their health.[8]  (*Id.* at 6.)

7      It was determined by the sentencing judge that under the U.S. Sentencing Guidelines

8  defendant Haar's adjusted offense level was 28 and her criminal history category was I, resulting

9  in an advisory sentencing guideline range calling for a sentence of between 78 and 97 months

10  imprisonment.  (Doc. No. 27 at 25.)[9]  As noted, in light of the various § 3553(a) factors, including

11  the defendant's serious medical condition of having suffered a stroke in 2016 due to an

12  arteriovenous malformation in her brain, the sentencing judge varied downward from the advisory

13  guideline range and sentenced the defendant to a term of imprisonment of 60 months.  (*Id.*)

14      Defendant's extensive fraudulent criminal conduct weighs heavily against the granting of

15  compassionate release at this juncture.  *See, e.g.*, *United States v. Scher*, No. 15-cr-00614 SOM,

16  2020 WL 3086234, at *3 (D. Haw. June 10, 2020) ("In considering Scher's history and

17  characteristics and the need to afford adequate deterrence for his crime, this court notes Scher's

18  extensive history of crimes of fraud or deceit.")

19  ───────────────

20  [8]  For example, it was reported that one of Horisons' patients became addicted to Norco as a
    result of improper treatment and that defendant Haar threatened to refuse service to patients who
21  complained about unnecessary medical and dental visits, threatened her employees' jobs on a
    regular basis, and appeared to prey on non-English speaking patients who did not question
22  defendant's unnecessary referrals.  (Doc. No. 14 (Presentence Report) at 6–8.)

23
    [9]  The U.S. Probation Office had determined the defendant's adjusted offense level to be 30 and
24  her advisory sentencing guideline range to therefore call for a sentence of 97 to 121 months.
    (Doc. No. 14 (Presentence Report) at 24.)  The presentence report recommended that defendant
25  receive a sentence of imprisonment of 97 months, the low end of the guideline range found in the
    report to be applicable.  (*Id.*)  Under the parties' plea agreement, the defendant was to receive
26  only a two-point upward adjustment for her aggravating role in the offense under U.S.S.G.
    § 3B1.1(c), as opposed to the 4-point upward adjustment recommended by the presentence report.
27  (*See* Doc. Nos. 2 at 10; 17 at 5.)  The sentencing court adopted the plea agreement of the parties
    in making its guideline calculation.  (Doc. No. 27 at 4.)
28

1    Lastly, as of the date of this order, defendant Haar has served less than eight months of her

2    60-month sentence.  The 60-month prison sentence imposed by the sentencing judge was already

3    eighteen months below the low end of the advisory sentencing guideline range.  In the court's

4    view, and especially in light of the egregious nature of the defendant's fraudulent criminal

5    conduct, an eight-month sentence would not adequately reflect the seriousness of defendant's

6    offense of conviction, promote respect for the law, provide just punishment, or afford adequate

7    deterrence to criminal conduct.[10]  *See* § 3553(a); *see also United States v. Purry*, No. 2:14-cr-

8    00332-JAD-VCF, 2020 WL 2773477, at *2 (D. Nev. May 28, 2020); *United States v. Shayota*,

9    No. 1:15-cr-00264-LHK-1, 2020 WL 2733993, at *5–6 (N.D. Cal. May 26, 2020) ("The length of

10   the sentence remaining is an additional factor to consider in any compassionate release analysis,

11   with a longer remaining sentence weighing against granting any such motion.") (citation omitted).

12                                           **CONCLUSION**

13        For the reasons explained above, the court concludes that defendant has not demonstrated

14   that "extraordinary and compelling reasons" exist warranting his compassionate release from

15   prison.  Moreover, the court finds that the granting of release at this time is not consistent with the

16   /////

17   /////

18   /////

19

20   [10]  Defendant alternatively suggest that the court release her "home into a program of . . . home
     detention." (Doc. No. 30 at 3.)  However, the CARES Act "'authorizes the BOP—not courts—to
21   expand the use of home confinement' under 18 U.S.C. § 3624(c)(2)."  *United States v. Fantz*, No.
     5:14-cr-32-BR, 2020 WL 3492028, at *1 (E.D.N.C. June 26, 2020) (quoting *United States v.*
22   *Nash*, No. 19-40022-01-DDC, 2020 WL 1974305, at *2 (D. Kan. Apr. 24, 2020) (collecting
     cases)); *see also United States v. Rice*, Case No. 12-cr-818-PJH, 2020 WL 3402274, at *4 (N.D.
23   Cal. June 19, 2020) (denying a defendant's request for release to home confinement made in
     conjunction with his motion for compassionate release because "the court has no authority to
24   designate the place of confinement" because the "Bureau of Prisons has the statutory authority to
     choose the locations where prisoners serve their sentence."); *United States v. Gray*, No. 4:12-CR-
25   54-FL-1, 2020 WL 1943476, at *3 (E.D.N.C. Apr. 22, 2020) (holding that the CARES Act "does
     not authorize the court to order defendant's placement in home confinement").  The district court
26   may only impose home detention as a condition of supervised release, rather than as part of a
     sentence of imprisonment.  *See United States v. Connell*, __ F. Supp. 3d __, 2020 WL 2315858,
27   at *5, n.6 & *7 (N.D. Cal. May 8, 2020).

28

sentencing factors set forth in 18 U.S.C. § 3553(a).  Accordingly, defendant's motion for

compassionate release (Doc. No. 30) is DENIED.

IT IS SO ORDERED.

Dated:   __**August 25, 2020**__                  _____

UNITED STATES DISTRICT JUDGE